[No. B219499. Second Dist., Div. Eight. June 13, 2011.]

LORENA LOPEZ, Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant and Respondent.

676

## COUNSEL

Arnold & Porter, James S. Blackburn, Tricia A. Cross and Ryan O. McMonagle for Plaintiff and Appellant.

Carmen A. Trutanich, City Attorney, Michael L. Claessens, Assistant City Attorney, Amy Jo Field and Lisa S. Berger, Deputy City Attorneys, for Defendant and Respondent.

## OPINION

**FLIER, J.**—This lawsuit stems from the tragic, untimely death of Suzie Pena (Suzie), who was killed by police officers in the special weapons and tactics (SWAT) unit as they attempted to rescue her from her father, Raul Pena (Pena), who held her hostage. Suzie was only 19 months old when she died. Appellant Lorena Lopez is Suzie's mother. She challenges the trial court's entry of nonsuit, finding that she presented no substantial evidence to support her causes of action for negligence and wrongful death. We conclude no substantial evidence supported appellant's theory that officers used unreasonable force—the basis of her negligence and wrongful death claims. We affirm the judgment.

Appellant's challenge rests principally on her claim that officers lacked probable cause to use deadly force against Pena because Suzie was not in danger. We reject her characterization of the evidence. Interpreting the evidence in the light most favorable to her, the uncontradicted evidence showed Suzie was in grave danger from Pena. He repeatedly threatened to kill her while he was armed and holding her hostage. According to appellant's counsel, immediately preceding Suzie's death, Pena claimed to be Tony Montana from the movie Scarface (Universal Pictures 1983) and threatened to "kill everybody that comes in[to his auto shop]" where he held Suzie hostage. Also according to appellant's counsel, Pena threatened to "kill the baby," Suzie. Even under the standard deferential to appellant, the evidence showed Suzie was in serious danger from Pena. No reasonable trier of fact could conclude otherwise.

## FACTS

Most of the evidence presented at trial was undisputed. Except for Dr. Paul Kim's testimony described in part 10., *post*, the remainder of the summarized evidence was undisputed.[1]

### 1. *Pena Threatens Appellant*

In the morning, on July 10, 2005, appellant contacted police. Appellant reported that Pena had threatened to kill her and to kill himself. After threatening appellant, Pena locked himself in a bedroom with Suzie.[2] Pena also threatened Ilsy, appellant's daughter and Pena's stepdaughter.

### 2. *Pena Takes Suzie Hostage*

That same afternoon, at approximately 3:00 or 4:00 p.m., Pena, who was armed, took Suzie to his autoshop. According to appellant, Pena was "inebriated and emotionally unstable."

Following a radio broadcast, several police officers assembled outside of Pena's autoshop. A sniper team was positioned near the autoshop. Four times, Pena stood outside the autoshop and shot at officers as he held Suzie in his right arm as a shield.

### 3. *Pena Threatens Suzie*

Throughout the afternoon, Pena claimed to be Tony Montana from the movie Scarface. He threatened to kill Suzie, stating, "I'm going to kill Suzie

---

[1] In summarizing all of the *undisputed* evidence, we reject appellant's argument that we must rely only on the evidence presented in her case-in-chief. (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581 [47 Cal.Rptr.2d 752] (*Kidron*) [in reviewing nonsuit, court should consider the whole record]; see also *Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1495 [21 Cal.Rptr.3d 36] [same].) We have disregarded any evidence that conflicts with appellant's evidence, as required for review of a nonsuit. (See *CC-California Plaza Associates v. Paller & Goldstein* (1996) 51 Cal.App.4th 1042, 1050–1051 [59 Cal.Rptr.2d 382] [A nonsuit or a directed verdict may be granted " ' "only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given." ' "].) If the jury had rendered a verdict in favor of appellant and the court had granted a judgment notwithstanding the verdict, we would similarly view the evidence in the light most favorable to appellant to determine if substantial evidence supported the verdict. (*Gunnell v. Metrocolor Laboratories, Inc.* (2001) 92 Cal.App.4th 710, 718 [112 Cal.Rptr.2d 195].) In any event, even if we relied only on the evidence presented in appellant's case-in-chief, our analysis would be the same.

[2] In the trial court, appellant used the spelling "Suzie." On appeal, she uses the spelling "Suzy." For the sake of consistency, we continue to use the spelling Suzie.

and take her to hell with me." Pena said "I'm going to kill my baby. I'm going to kill my baby before I leave my baby to my wife, that whore." Pena threatened to take Suzie "to hell with him" over 10 times. Pena mentioned that he had served time in jail and "wasn't going back." Pena said he had been in the Salvadoran military and had killed before. Pena claimed to have two handguns, a shotgun, and extra ammunition.

### 4. Officers Rescue Pena's Stepdaughter

Initially, in addition to Suzie, Pena also held Ilsy inside the autoshop. Officer Daniel Sanchez rescued Ilsy from the autoshop. After her rescue, Ilsy told officers that Pena was "going to kill the baby [Suzie]." Ilsy warned officers that Pena was armed with a handgun and 12-gauge shotgun. Ilsy informed officers there were two other persons inside the autoshop and that Pena had been using cocaine. Pena continued to threaten to kill Ilsy after she had escaped, but before Pena learned of her escape.

### 5. A SWAT Team Congregates Outside the Autoshop

In addition to the police officers called to the scene of Pena's autoshop, a SWAT team, made up of officers with special training in hostage recovery situations, assembled outside the autoshop to assist the other officers. The SWAT team included Enrique Anzaldo, Daniel Sanchez, Chester McMillion, Robert Gallegos, Eduardo Perez, and William Casey. McMillion was the team leader. The SWAT team used an armored vehicle for cover.

The officers had predetermined if Pena surrendered Suzie, surrendered his weapons, or surrendered himself, officers would not initiate an assault. None of these contingencies occurred.

### 6. Officers Attempt to Negotiate with Pena

From appellant's residence near the auto shop, beginning at approximately 5:00 p.m., officers attempted to negotiate with Pena. Appellant asked officers to help her because her "baby is in there." Appellant also told officers that Pena had been drinking and using cocaine that day. Appellant's son told officers that two other persons, Pena's employees, might also be inside the autoshop.

Officer Robert Quiroz spoke to Pena from approximately 5:00 p.m. to 6:10 p.m. During that time, Pena did not fire any shots. Later, Officer Louis Reyes, a trained hostage negotiator, attempted to negotiate with Pena. Both Quiroz and Reyes had difficulty speaking to Pena because he was not being rational

and was making constant threats. About five minutes after Pena disconnected the phone, refusing to speak to Reyes, shots were fired.

### 7. O'Sullivan Attempts to Shoot Pena

After Pena disconnected the phone with police negotiators, he exited the autoshop, holding Suzie in his right arm. Officer Dennis O'Sullivan was outside, positioned inside the armored vehicle, with an elevated view. When O'Sullivan peered through his rifle scope, he saw Pena move his hand as if he were about to remove his gun from his waistband. O'Sullivan shot Pena. At the time he shot Pena, O'Sullivan focused on Pena's head. But, just prior to shooting Pena, O'Sullivan saw Pena move his hand to retrieve his gun. Although Pena did not directly point his gun at Suzie, O'Sullivan believed Pena was going to shoot Suzie. O'Sullivan fired at Pena to prevent Pena from killing Suzie.

### 8. The SWAT Team Initiates an Assault

Immediately after O'Sullivan shot at Pena and at McMillion's command, Officers Sanchez, Perez, Gallegos, and Casey entered the autoshop. Officer McMillion initiated the emergency assault because he believed Pena was going to kill Suzie and possibly the other two persons in the building. McMillion felt that Suzie's life was in imminent peril.

Officers developed a plan to save Suzie consisting of using "an L configuration," which required the officers to place themselves in that shape in front of the suspect in order to divide the suspect's attention away from the hostage and toward the officers. Officer Casey was armed with a submachine gun while Gallegos, Perez, and Sanchez were armed with machine guns.

When they entered the autoshop, the officers expected Pena to be on the floor as a result of O'Sullivan's shot. Pena was not on the floor, but instead he was positioned in an interior office and shot through drywall in the direction of the officers. The interior office was a small space measuring approximately 12 feet by eight feet. Pena shot at least six shots through the drywall. One of Pena's shots hit Sanchez.

Prior to the officers entering the small office, McMillion did not order a retreat because the officers' "responsibility [was] to save Suzie." Officer Sanchez entered the office because he thought Suzie was in imminent peril. Officer Gallegos did not consider retreating because his mission was to separate Suzie from Pena, and he entered the office to rescue Suzie. Officer Perez also did not consider retreating. According to Officer McMillion,

retreating would have been a dereliction of the officers' duty because Suzie was still with Pena and two of Pena's employees, whom officers had been told were inside.

According to a predesigned plan, Officer Sanchez threw a stun grenade into the office causing a loud noise and generating smoke. Officers placed themselves in an "L configuration," around Pena, even though Sanchez was injured and Perez had fallen upon entering the office. Pena was shooting at the officers, as he held Suzie as a shield.

All four officers simultaneously fired on Pena. Perez fired 27 shots, aiming at Pena's left side. Sanchez fired approximately 11 shots aiming at Pena's left torso because Pena previously had held Suzie in his right arm. Sanchez was blinded by muzzle flashes from Pena's weapon and could not see Suzie. Gallegos fired approximately 11 times at Pena's left side. Casey entered last and also fired six shots at Pena. Together the officers fired 50 to 55 shots inside the office within three and a half to six seconds.

### 9. *Pena and Suzie Are Killed*

Both Pena and Suzie were killed. Either Officer Gallegos, Sanchez, or Perez fired the bullet that killed Suzie. In all, Pena had fired 39 rounds prior to his death.

### 10. *SWAT Guidelines*

SWAT is a unit within the Metropolitan Division of the Los Angeles Police Department (LAPD). SWAT follows an LAPD department manual, which applies to every officer. SWAT also has separate guidelines (Guidelines), which apply only to SWAT officers. The Guidelines specify that, in a hostage situation, the safety of the hostage is paramount. The Guidelines also require officers to develop contingency plans.

Dr. Kim, a former police officer, testified that SWAT officers violated the Guidelines. As a police officer, Kim had served in internal affairs, which was responsible for investigating excessive force claims made against police officers. When he retired, he was the commander of a training group. Kim was not a member of SWAT but believed he was qualified to evaluate SWAT Guidelines because "all officers in L.A.P.D. . . . are subject to the same rules, same policies, same procedures in terms of use-of-force assessment and evaluation."

Among other things, Dr. Kim testified that the SWAT officers failed to prioritize the safety of Suzie and failed to develop an adequate operational

plan. Kim believed that the SWAT officers should have retreated from the autoshop when they realized Pena had not been hit instead of entering the office where Pena held Suzie.

On cross-examination, Dr. Kim acknowledged that he had never received training in SWAT tactics. He was not familiar with the protocol on a tactical retreat once SWAT officers initiated an assault. Kim acknowledged that the outcome of a hostage situation is unpredictable. Kim would have "focused on buying time," such as by attempting to negotiate with Pena. He believed that officers were effective negotiators because Pena did not fire his weapon when he spoke to them on the phone. Kim agreed that the SWAT team initiated the assault "to rescue . . . the hostage."

## PROCEDURE

### 1. *Complaint*

Appellant filed a complaint against the City of Los Angeles (City) asserting causes of action for negligence and wrongful death.[3] Appellant's counsel acknowledged that the *sole* basis for liability underlying both causes of action was that the officers used unreasonable force.

### 2. *Nonsuit*

The City moved for nonsuit, and appellant opposed the motion. The trial court granted nonsuit after both sides rested. In a thorough opinion, the trial court found: "In this particular case, the issue is the unreasonable use of force with respect to the most unfortunate death of Suzie Pena." The court considered the following facts: "That there was an attempted negotiation; that that attempt failed not because of any inattention or lack of effort or lack of dedication by the police agencies and police representatives, but because of the failure of Mr. Pena to be in the state where negotiations would be productive. [¶] Mr. Pena had voluntarily intoxicated himself, had addled his brain to the point where no communication was possible with him, to the point where he had a rant and a rave, portrayed himself as a gangland figure from the movie Scarface, threatened to kill himself, others and Suzie. In fact did involve himself in gunfire, threatening the life of his—Suzie's step[sister], Ilsy. This was not a man . . . who could be rationally spoken to or negotiated with. [¶] There was clear intent on Pena's part to use violence. He had

---

[3] Other causes of action and named defendants were dismissed from the lawsuit. We requested supplemental briefing regarding federal authority holding than an excessive force claim is not viable in a suit alleging the personal injury of a hostage. (See, e.g., *Childress v. City of Arapaho* (10th Cir. 2000) 210 F.3d 1154, 1157.) The parties agree that the principle expressed in *Childress* is not applicable to a state negligence cause of action.

already used violence, and there was no question in the court's mind that the peace officers involved had reasonable cause to believe that he would continue his acts of violence, particularly in his addled mental state based upon his intoxication. [¶] The court . . . finds that reasonable jurors here could only draw one conclusion from the evidence presented, and that was that the officers' use of force was reasonable. That being the only basis for the claim, the motion for nonsuit is granted." This appeal followed.

## DISCUSSION

Appellant contends nonsuit was improper because she presented evidence that the following conduct was an unreasonable use of force: (1) O'Sullivan's decision to fire upon Pena and (2) the deadly force used in the final assault after SWAT officers entered the autoshop. Appellant also argues that the manner in which the SWAT team used deadly force was negligent. After providing background, we discuss each of appellant's arguments seriatim. We conclude that appellant demonstrates no substantial evidence to support her claim of unreasonable use of force, and the trial court properly granted nonsuit on her negligence and wrongful death causes of action.

### 1. *Background*

" 'The granting of a motion for nonsuit is warranted when, disregarding conflicting evidence, giving plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference that may be drawn from the evidence, the trial court determines that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff.' [Citations.] [¶] Plaintiff cannot prevail unless he can demonstrate *substantial* evidence in the record to support each claim asserted. Mere conjecture or nonsensical interpretations of evidence are not sufficient to overturn a nonsuit." (*Kidron, supra*, 40 Cal.App.4th at p. 1580; see also *Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107, 115 [40 Cal.Rptr.3d 48].) In evaluating a nonsuit, both the trial court and the appellate court "may not weigh the evidence or consider the credibility of witnesses. Instead, it must accept the evidence most favorable to the plaintiff as true and disregard conflicting evidence." (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1065 [80 Cal.Rptr.2d 704].)

As explained in *Kidron*: " 'The rules governing the granting of a nonsuit . . . do not relieve the plaintiff of the burden of establishing the elements of his case. The plaintiff must therefore produce evidence which supports a logical inference in his favor and which does more than merely permit speculation or conjecture. [Citations.]' . . . The decision about what inferences can permissibly be drawn by the fact finder are questions of law for

determination by the court, inasmuch as an inference may not be illogically and unreasonably drawn, nor can an inference be based on mere possibility or flow from suspicion, imagination, speculation, supposition, surmise, conjecture or guesswork." (*Kidron, supra,* 40 Cal.App.4th at pp. 1580–1581, quoting *Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 [209 Cal.Rptr. 456].) Stated otherwise, to reverse the nonsuit, this court must find substantial evidence to support a verdict for appellant. (*O'Keefe v. South End Rowing Club* (1966) 64 Cal.2d 729, 733 [51 Cal.Rptr. 534, 414 P.2d 830].)

■ Whether appellant presented substantial evidence to support a verdict in her favor depends on whether she presented evidence establishing each element of her alleged causes of action—negligence and wrongful death. The elements of a cause of action for wrongful death are a tort, such as negligence, and resulting death. (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 806 [108 Cal.Rptr.3d 806, 230 P.3d 342].) The elements of a negligence cause of action are duty to use due care and breach of duty, which proximately causes injury. (*Holmes v. Summer* (2010) 188 Cal.App.4th 1510, 1528 [116 Cal.Rptr.3d 419].) In the trial court, appellant stated that both causes of action were based solely on the unreasonable use of force against Pena, which appellant had the burden of proving.[4] (*Edson v. City of Anaheim* (1998) 63 Cal.App.4th 1269, 1271 [74 Cal.Rptr.2d 614].)

■ The standard for evaluating the unreasonable use of force reflects deference to the split-second decisions of an officer and recognizes that, unlike private citizens, officers may use deadly force. An officer " ' "may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance." ' " (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 527 [89 Cal.Rptr.3d 801] (*Brown*), quoting *Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1102 [16 Cal.Rptr.3d 521].) " ' "Unlike private citizens, police officers act under color of law to protect the public interest. They are charged with acting affirmatively and using force as part of their duties, because 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.' " ' " (*Brown*, at p. 527, citations omitted.)

■ " ' "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. [Citation.] . . . [T]he question is whether the

---

[4] Appellant's counsel affirmed in the trial court that "with respect to the due care, the negligence is the unreasonable use of force," and no other basis existed for liability.

officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." ' " (*Brown, supra*, 171 Cal.App.4th at pp. 527–528, citations omitted.) "In calculating whether the amount of force was excessive, a trier of fact must recognize that peace officers are often forced to make split-second judgments, in tense circumstances, concerning the amount of force required." (*Id.* at p. 528.) " ' "We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." [Citation.]' [Citation.] Placing the burden of proof on the plaintiff to establish that an officer's use of force was unreasonable 'gives the police appropriate maneuvering room in which to make such judgments free from the need to justify every action in a court of law.' " (*Ibid.*)

 "Where potential danger, emergency conditions, or other exigent circumstances exist, ' "[t]he Supreme Court's definition of reasonableness is . . . 'comparatively generous to the police. . . .' " [Citation.]' [Citation.] ' "In effect, 'the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases. . . .' [Citation.]" ' [Citation.] A police officer's use of deadly force is reasonable if ' " 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.' [Citations.]" [Citation.]' [Citation.] ' "Thus, 'an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack.' " ' " (*Brown, supra*, 171 Cal.App.4th at p. 528, citations omitted.)

## 2. *O'Sullivan's Shot*

With respect to O'Sullivan's decision to fire on Pena, the trial court found that the testimony was uncontradicted Pena reached for his gun just before O'Sullivan shot him. "As a matter of fact, the video showing him running back into the office following O'Sullivan's shot has the gun in his left hand. He did pull it [out of his waistband]."[5]

Appellant argues "evidence was presented from which a juror could reasonably conclude that, when . . . Officer O'Sullivan fired upon Pena, he did not have probable cause to believe that Pena was a danger to Suz[ie] or others." As support, appellant states that "Pena had *never once* turned his

---

[5] The video is not included in our record, but appellant does not challenge the trial court's finding that the video showed Pena was reaching into his waistband just prior to O'Sullivan's shot.

weapon in the direction of baby Suz[ie]. In addition, when O'Sullivan took his shot, there had been no exchange of gunfire for an hour and twenty minutes."

Appellant's claim that O'Sullivan lacked probable cause to shoot at Pena is based on the assumption that Suzie was not in danger. That assumption is not supported by *any* evidence in the record and constitutes a nonsensical interpretation of the evidence insufficient to overturn a nonsuit. (*Kidron, supra,* 40 Cal.App.4th at p. 1581; see also *Ritschel v. City of Fountain Valley, supra,* 137 Cal.App.4th at p. 115.)

What the undisputed evidence shows is that throughout the afternoon of July 10, Pena in an inebriated state threatened to kill Suzie. He made numerous, repeated verbal threats. For example, he stated that he would "take her to hell" with him. He warned that he would never let Suzie return to her mother. In addition to his verbal threats, he shot at officers while holding Suzie, showing no regard for her well-being. Pena's stepdaughter was afraid Pena would kill Suzie and warned officers. Even appellant asked officers for assistance because Pena held Suzie as a hostage.

In the face of this overwhelming evidence that Pena posed a danger to Suzie, the fact that appellant did not point his weapon directly at Suzie does not support the inference that Pena was not a danger to Suzie. Officers were not required to wait until Pena pointed his gun at Suzie and pulled the trigger to conclude that appellant's threats were real and exposed Suzie to great risk. (Cf. *Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 345 [54 Cal.Rptr.2d 772] [fact that suspect held a knife at his waist did not render him less of a threat when he had threatened to kill officers].) The fact that Pena did not shoot for an hour and 20 minutes as he spoke to negotiators is irrelevant because Pena hung up the phone and refused to continue negotiating. The time between Pena's shots does not support the inference that Suzie was out of danger because Pena refused to surrender Suzie and had threatened her throughout his conversation with negotiators. As a matter of law, a reasonable officer in O'Sullivan's position had probable cause to believe Pena was a danger to Suzie. (*Id.* at p. 348 [correct viewpoint is that of the reasonable officer, "not the viewpoint of others"].)

Finally, even if appellant could show that O'Sullivan lacked probable cause to believe Pena was a danger to Suzie, she cannot show that O'Sullivan's conduct caused her any damages. Both appellant's negligence and wrongful death actions were based on Suzie's death. (*Munoz v. City of Union City, supra,* 120 Cal.App.4th at p. 1093 [negligence cause of action requires evidence that breach was proximate or legal cause of resulting injury]; *Boeken v. Philip Morris USA, Inc., supra,* 48 Cal.4th at p. 806 [wrongful

death cause of action requires tort such as negligence or other wrongful act and resulting death].) It was undisputed Gallegos, Perez, or Sanchez fired the fatal shot. Therefore, appellant cannot establish liability for negligence or wrongful death based on O'Sullivan's shot.

### 3. *Final Assault*

With respect to the decision to use deadly force in the final assault, the trial court concluded: "Officers . . . had probable cause and rights within their discretion to go in after Pena, particularly since there were shots then fired from inside the room out and . . . the officers could reasonably have believed may involve Suzie or may have involved these other two individuals, . . . Pena's associates, who had still not been accounted for and whose existence was made known to the peace officers." "[R]easonable minds cannot differ that the peace officers' priority was to try to rescue Suzie at the risk of their own lives when they entered that room. There was much evidence and much discussion about the priorities. Other than Dr. Kim's speculation, there was no evidence whatsoever that the officers' priority was not to rescue Suzie. In fact, the court finds the evidence to be overwhelming that that is what they went in there for."

Appellant argues that there was evidence the SWAT team's final assault was not objectively reasonable because they did not have probable cause to believe that Pena posed a substantial threat of harm to Suzie. She further argues that Pena was shooting in the direction of the officers and not Suzie. According to appellant, if the officers decided to use deadly force in response to the threat Pena posed to them, the use of deadly force was unreasonable.

### A. *The Officers' Conduct Was Objectively Reasonable to Protect Suzie*

Appellant's claim that "a juror could reasonably conclude that, given the evidence that Pena was not a threat to Suz[ie], it was unreasonable for the officers to fail to even consider retreating" is based on the incorrect predicate that Pena posed no risk to Suzie. (Italics omitted.) As previously explained, the only reasonable conclusion is that the officers had probable cause to believe that Pena posed a threat to Suzie when the SWAT team entered the autoshop. The same evidence showed Suzie was in danger when SWAT officers entered Pena's office where he held Suzie.

No substantial evidence supports appellant's theory that the officers entered the office because of the threat Pena posed to them. The *evidence* in the record showed that the officers went into the autoshop and into the office to rescue Suzie. No contrary evidence was presented. Even appellant's expert acknowledged that the SWAT team initiated the assault "to rescue . . . the hostage."

■ Speculation by appellant's expert that when entering the office officers focused on self-defense rather than on saving Suzie does not constitute substantial evidence.[6] " 'A properly qualified expert may offer an opinion relating to a subject that is beyond common experience, if that expert's opinion will assist the trier of fact. [Citation.] Even so, the expert opinion may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact. [Citation.]' [Citation.]" (*Brown, supra,* 171 Cal.App.4th at p. 529.) Dr. Kim's opinion that the officers' focus became their own self-defense is based on an assumption of fact without any evidentiary support and therefore does not constitute substantial evidence.

## B. *The Officers' Conduct Was Objectively Reasonable to Protect Themselves*

■ Even if the officers had entered the office because of the threat Pena posed to them, the officers' use of deadly force was reasonable under an objective standard. As previously explained, "An officer ' "may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance." ' [Citations.]" (*Brown, supra,* 171 Cal.App.4th at p. 527.) "A police officer's use of deadly force is reasonable if ' " 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury *to the officer or others.*' [Citations.]" [Citation.]' [Citation.]" (*Id.* at p. 528, italics added.) " ' " '[A]n officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack.' " [Citation.]' [Citation.]" (*Ibid.*)

Here, Pena was shooting directly at officers and hit Sanchez. At least six shots went through the drywall, and Pena continued to shoot after the officers entered the office. The officers were not required to desist in the face of Pena's resistance. (*Brown, supra,* 171 Cal.App.4th at p. 527.) The use of deadly force in response to Pena's attack was reasonable. (*Id.* at p. 528.) No contrary inference is available from the evidence presented at trial.

## 4. *Manner of Using Deadly Force*

Officers have a duty " 'to use reasonable care in deciding to use and in fact using deadly force.' [Citation.]" (*Brown, supra,* 171 Cal.App.4th at p. 534.)

---

[6] Appellant's expert testified that the "focus [in entering the office] was not on saving the hostage, the focus became self-defense of the officers involved, and knowing the tender age and the relationship and the smallness of the space involved the number of people firing, it just was not a safe thing to do."

The trial court found: "The fire power that was used by the peace officers the court finds to be within their discretion. They had no idea what they would find when they got into that room, whether the other two were armed, if there were two in there. . . . There is testimony about a shotgun and another weapon in there besides the handgun of Mr. Pena."

Appellant argues a reasonable jury could conclude the manner in which the SWAT team employed deadly force was negligent. Appellant focuses this argument on the number of shots taken by each officer, and the fact that Pena was holding Suzie as a shield as the officers fired upon him. Specifically, appellant challenges the following conduct: "In the course of 3 1/2 to 6 seconds, in a smoke-filled room, Perez fired 27 shots at Pena, Sanchez fired between 6–11 shots while injured and blinded by muzzle flashes from Pena's gun, and Gallegos fired 12 more shots" as Pena moved around and held Suzie. Appellant also relies on Dr. Kim's testimony, which we discuss in the final part.

A. *No Substantial Evidence Supports the Inference That the Manner of Using Deadly Force Was Unreasonable*

Appellant identifies no evidence that raises a triable question whether officers breached a duty of care. In view of the exigency of the circumstances confronting the officers—Pena who claimed to have multiple weapons was shooting directly at the officers and threatening to kill Suzie—their concurrent shooting multiple times at Pena cannot constitute excessive force under an objective standard. "The number of shots by itself cannot be determinative as to whether the force used was reasonable. . . . That multiple shots were fired does not suggest the officers shot mindlessly as much as it indicates that they sought to ensure the elimination of a deadly threat." (*Elliott v. Leavitt* (4th Cir. 1996) 99 F.3d 640, 643.) To the extent appellant is suggesting that the officers should have stopped after each shot and assessed its effect at a time when Pena—in an inebriated and emotional state—was shooting directly at the officers, the suggestion fails to recognize the perspective of the reasonable officer at the scene. The officers' use of force "was not excessive or unreasonably dangerous relative to the danger" Pena's actions posed. (*Brown, supra,* 171 Cal.App.4th at p. 528.)

Appellant's reliance on *Munoz v. Olin* (1979) 24 Cal.3d 629 [156 Cal.Rptr. 727, 596 P.2d 1143] is misplaced. In that case, the court explained: " ' "[T]he actor's conduct must always be gauged in relation to all the other material circumstances surrounding it and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law." ' [Citation.]" (*Id.* at p. 637.) In *Munoz v.*

*Olin*, peace officers intentionally shot a suspected arsonist as he was fleeing. (*Id.* at p. 631.) The court found a triable issue of fact regarding negligence because one of the peace officers shot numerous times in addition to failing to attempt other means to apprehend the suspect. (*Id.* at p. 637; see also *Tennessee v. Garner* (1985) 471 U.S. 1, 10 [85 L.Ed.2d 1, 105 S.Ct. 1694] [use of deadly force improper to apprehend nonviolent suspect].)

This case is nothing like *Munoz v. Olin*. Pena was not attempting to flee. Instead, he was shooting directly at officers and holding his child hostage. When all of the material circumstances are considered, as required by *Munoz v. Olin*, the only reasonable conclusion is that the officers' use of force was reasonable.

*Brown* supports our conclusion. In *Brown*, the court affirmed summary judgment against an innocent bystander injured by police fire as police attempted to apprehend a murder suspect. Four officers had fired rounds at a suspect, together firing 33 or 34 rounds, one or more of which hit the plaintiff. (*Brown, supra*, 171 Cal.App.4th at pp. 522–523.) The court concluded the officers' shooting at the suspect was objectively reasonable as a matter of law, noting that the use of force was not unreasonably dangerous relative to the danger the suspect's actions posed. (*Id.* at pp. 520, 528.) The officer did not shoot into the crowd and "[i]n view of the exigency of the circumstances he was facing, [the officer] met his duty to use reasonable care in employing deadly force." (*Id.* at p. 529.) As in *Brown*, considering the exigency of the circumstances—with Pena shooting directly at officers and blinding Sanchez by his muzzle fire—the officers here used reasonable care in employing deadly force.

## B. *Dr. Kim's Testimony Does Not Raise a Triable Question*

Appellant relies on Dr. Kim's testimony in arguing that the manner of the shooting was negligent. As we explain, Kim's testimony does not raise a triable question.

### i. *Background*

When asked "was there a violation of SWAT [Guidelines] of [*sic*] not coming up with an operational plan that included the safety of the hostage," Dr. Kim responded as follows: (1) The SWAT officers' plan was inadequate because they "ended up in a very small office where five people are firing. There were three machine guns [(Perez, Sanchez, and Gallegos)], one submachine gun [(Casey)] and one handgun [(Pena)] all firing at the same time at the same place." (2) The plan developed by SWAT officers was also inadequate because "every time he [(Pena)] was seen, [he] had [a] 19-month-old infant hostage on his right side as if he's wearing it like a piece of

clothes, and this is not any hostage. This is [an] infant hostage, 19 months old, unable to think, unable to make any decisions on her own due to her age."[7] In Kim's opinion, officers should have retreated when they entered the building and Pena was not on the ground.

ii. *Analysis*

 The fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable. (*Reynolds v. County of San Diego* (9th Cir. 1996) 84 F.3d 1162, 1170 [finding expert testimony did not raise triable issue of material fact on excessive force claim], overruled on another ground in *Acri v. Varian Associates, Inc.* (9th Cir. 1997) 114 F.3d 999, 1001.) In this context, the "question is whether a peace officer's actions were objectively reasonable based on the facts and circumstances confronting the peace officer." (*Brown, supra,* 171 Cal.App.4th at p. 527.) When the correct standard is applied, it was objectively reasonable as a matter of law for the SWAT officers to follow Pena into the office and attempt to separate Suzie from Pena, who the officers reasonably believed posed a threat to Suzie. (*Ibid.* [" ' "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." ' "].) No evidence supported the inference that *from the perspective of a reasonable officer on the scene,* retreat was either required or desirable. (*Id.* at p. 537 [suggestion that other conduct desirable was pure conjecture and did not show actual response unreasonable].) McMillion's testimony that retreating when Suzie remained in danger would have been a dereliction of duty was undisputed, and Dr. Kim, who was unaware of the protocol regarding a retreat, provided no reasons for his opinion that officers should have retreated. (See *id.* at p. 530 [" ' "[A]n expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based." ' "].) In short, appellant presented no substantial evidence that officers breached their duty not to apply deadly force in a negligent manner. Judgment for the defendant was required as a matter of law.

---

[7] We assume without deciding that Dr. Kim was qualified to opine on violations of the Guidelines even though he was never a SWAT officer and never trained in SWAT tactics. To qualify as an expert, the expert must have special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject of his testimony. (Evid. Code, § 720.) Although Kim claimed that he was qualified because all officers were subject to the same "set of laws, policies and procedures," the undisputed evidence showed that the Guidelines applied only to SWAT officers.

## DISPOSITION

The judgment is affirmed. Respondent is entitled to costs on appeal.

Bigelow, P. J., and Grimes, J., concurred.

A petition for a rehearing was denied July 1, 2011, and appellant's petition for review by the Supreme Court was denied September 28, 2011, S195080. Kennard, J., and Liu, J., were of the opinion that the petition should be granted.