Filed 9/17/15  Arrendell v. Perez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ALFRED ARRENDELL, | D065719 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. ECU07337) |
| S. PEREZ et al., | |
| Defendants and Respondents. | |


APPEAL from a judgment of the Superior Court of Imperial County, Juan Ulloa, Judge.  Affirmed.


Schonbrun, Desimone, Seplow, Harris, Hoffman & Harrison and Catherine Sweetser for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Jonathan L. Wolff, Assistant Attorney General, Thomas Patterson and Christopher H. Findley, Deputy Attorneys General, for Defendants and Respondents.

Alfred Arrendell appeals from a summary judgment in favor of defendants S. Perez, A. Din and R. Lam in his lawsuit against them alleging negligence in the performance of their duties as correctional officers in responding to an inmate fight that left Arrendell blinded in one eye. We conclude that the trial court properly granted summary judgment in favor of defendants, and we accordingly affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Arrendell was an inmate at Centinela State Prison, where Perez and Din were correctional officers and Lam was a correctional sergeant. On February 9, 2010, Arrendell was in the prison yard when a fight broke out between three inmates whom he did not know: Martinez, Rios and Bivens.

Perez was stationed in the tower overlooking the prison yard, approximately 32 feet above the ground. She observed as Martinez and Rios chased Bivens, caught up to him and began fighting with him. Martinez and Rios attacked Bivens with punches and slicing motions that indicated they had weapons. Perez saw blood coming from Bivens's head as Bivens tried to break loose. Bivens also had a weapon and was using it.[1]

Perez ordered all of the inmates on the yard to get down, and reported the fight on the institutional radio. Arrendell dropped prone to the ground about 100 feet away from the fight. Din and Lam responded to the prison yard along with other staff.

---

[1] Four weapons of sharpened melted plastic or sharpened metal, ranging from four to six inches long, were found in the prison yard after the fight.

2

While the other officers were arriving on the scene, Perez attempted to get the three inmates to stop fighting by using a 40 mm launcher, which shoots nonlethal rounds. First, Perez shot a direct impact round, consisting of a rubber projectile. Perez aimed the round at Martinez, but the shot missed. Perez ordered the fighting inmates to get down again, but they refused to comply, so she deployed a different type of nonlethal round, consisting of a cartridge containing three wood blocks that are designed to disperse upon hitting the ground about three feet in front of a target (wood block round). She used the wood block round because it would disperse into three blocks and thus had a better chance of hitting one of the fighting inmates. Perez did not hit any of the inmates with the wood block round.

When the officers on the ground responded, including Din and Lam, they repeatedly ordered the inmates to stop fighting, but the inmates did not comply. Din and one other officer deployed a total of three oleoresin capsicum ("O.C.") grenades, which contain a substance similar to pepper spray. The O.C. grenades did not stop the fight. Neither Lam nor Din used physical force against the fighting inmates because, consistent with their training, they were concerned that the inmates would use weapons against them. Instead, the officers formed a skirmish line approximately 10 feet away from the fight. Although no other witness recalled such an occurrence, Arrendell testified in his deposition that at some point during the fight a correctional officer approached the fighting inmates while they were wrestling on the ground, straddled them, and raised his baton as if to strike them, but then desisted when Lam directed him to stop.

3

The inmates continued to fight, and Bivens was bleeding profusely. Perez believed Bivens would be killed if she didn't shoot Rios or Martinez, and she therefore decided that deadly force was necessary. As Perez stated in her deposition, "It had gone too long already and I was afraid that if I didn't do something right away [Bivens] would have died." Perez armed herself with a Mini-14 rifle that shoots .223 caliber rounds. After the inmates again refused to comply with orders to stop fighting, Perez had a clear shot on Rios and fired, aiming at Rios's upper torso. The shot missed and the fighting continued.

Perez then transitioned back to the wood block round, as she was no longer able to get a good shot on any of the assailants due to the fact that they were moving around. According to Perez and Din, the second wood block round hit Martinez, and he stopped fighting, threw his weapon over the fence, and laid down on the ground, not getting back up until the fight was over. According to Arrendell's account, Martinez was hit with either a wood block round or a direct impact round, which caused him to get down on the ground and stop fighting for a short time, but then he got back up and rejoined the fight.[2]

As Perez and Din described the situation, Bivens and Rios continued to fight after Martinez left, and Bivens was still bleeding profusely. Perez continued to believe that Rios would kill Bivens if she did not shoot Rios. When she had a clear shot on Rios,

_____

[2] The eyewitness accounts also differed as to whether the fight took place with the combatants on the ground, on their feet in a standing position, or a combination of both. According to Perez, the inmates never fought on the ground. Din and Lam stated that the inmates moved back and forth between standing and being on the ground, and Arrendell stated that the inmates wrestled on the ground for most of the fight.

Perez fired her Mini-14 rifle at Rios's upper torso. The shot missed. After again ordering the inmates to stop fighting and then waiting 10 seconds, Perez fired another shot from the Mini-14 rifle. After that shot, Rios stopped fighting and went prone to the ground. Bivens moved away and sat down, and the fight was over. A photograph in the record shows Bivens with numerous bloody wounds immediately after the fight.

Perez's third rifle shot ricocheted after missing Rios and travelled approximately 100 feet to where Arrendell was prone on the ground. The bullet entered Arrendell's skull through his left eye, causing him to permanently lose sight in that eye. Medical personnel arrived within 60 seconds to tend to Arrendell's injuries.

Arrendell filed a lawsuit against Perez, Din and Lam (collectively defendants), asserting a single cause of action for negligence.[3] Arrendell alleged that defendants did not use reasonable care in employing deadly force to control the fight in the prison yard, causing him to suffer injury.

Defendants filed a motion for summary judgment, which argued that the undisputed facts established they did not breach their duty of care to act reasonably in using deadly force. The trial court granted the motion for summary judgment, explaining that "the undisputed facts show that defendants' actions fell within a reasonable range of conduct." Arrendell appeals from the judgment.

---

[3] Arrendell earlier filed a federal lawsuit against the State of California and several individuals, which the parties stipulated to having dismissed in favor of litigating the case in superior court.

II

DISCUSSION

A.    *Applicable Legal Standards*

    1.    *Summary Judgment Standards*

We begin our discussion with an overview of the rules governing motions for summary judgment.

A defendant "moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  A defendant may meet this burden either by showing that one or more elements of a cause of action cannot be established or by showing that there is a complete defense.  (*Ibid.*)  "[A]ll that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action[;] . . . the defendant need not himself conclusively negate any such element . . . ."  (*Id.* at p. 853.)  If the defendant's prima facie case is met, the burden shifts to the plaintiff to show the existence of a triable issue of material fact with respect to that cause of action or defense.  (*Id.* at p. 849; *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261 (*Silva*).)

We review a summary judgment ruling de novo to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law.  (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)  "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for

summary judgment." (*Lenane v. Continental Maritime of San Diego, Inc.* (1998) 61 Cal.App.4th 1073, 1079.) Thus, on appeal we apply the same three-step analysis used by the trial court. "We identify the issues framed by the pleadings, determine whether the moving party has negated the opponent's claims, and determine whether the opposition has demonstrated the existence of a triable, material factual issue." (*Silva*, *supra*, 65 Cal.App.4th at p. 261.)[4]

2.    *Law Applicable to the Officers' Use of Deadly Force*

We next examine the law that applies to Arrendell's cause of action for negligence against defendants.

" '[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' " (*Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 629 (*Hayes*).)

Here, because Arrendell was injured when the officers used deadly force to control the fight in the prison yard, we focus on the case law establishing the circumstances

---

4      In a footnote in his opening brief, Arrendell states that had the case gone to trial he "would have presented expert testimony regarding the training of correctional officers, including a policy preventing the discharge of weapons if there is reason to believe persons other than the target will be injured. We do not consider this evidence as it was not submitted to the trial court in connection with the summary judgment motion. (*Uriarte v. United States Pipe & Foundry Co.* (1996) 51 Cal.App.4th 780, 790 [" '[I]n reviewing a summary judgment, the appellate court must consider only those facts before the trial court, disregarding any new allegations on appeal.' "].)

under which a law enforcement officer may reasonably use deadly force.[5]  Our Supreme

Court "has long recognized that peace officers have a duty to act reasonably when using

deadly force.  [Citations.]  The reasonableness of an officer's conduct is determined in

light of the totality of circumstances." (*Hayes*, *supra*, 57 Cal.4th at p. 629.)  The same

standards apply when a suspect is injured by an officer's use of deadly force or, when as

here, an officer uses deadly force that unintentionally causes injury to an innocent

bystander.  (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 534 (*Brown*) [examining

whether officers acted reasonably under the totality of circumstances in using deadly

force that caused injury to a bystander in a nearby building].)

More specifically, case law establishes that "[a] police officer's use of deadly force

is reasonable if ' " 'the officer has probable cause to believe that the suspect poses a

significant threat of death or serious physical injury to the officer or others.' " ' " (*Brown*,

*supra*, 171 Cal.App.4th at p. 528.)  "Where potential danger, emergency conditions, or

other exigent circumstances exist, ' "[t]he Supreme Court's definition of reasonableness is

. . . 'comparatively generous to the police. . . .' " [Citation.]' [Citation.]  ' "In effect, 'the

Supreme Court intends to surround the police who make these on-the-spot choices in

dangerous situations with a fairly wide zone of protection in close cases.' " ' " (*Ibid*.)

---

[5]     Although the case law that we cite was developed in noncustodial situations where a plaintiff was injured by law enforcement officers' use of deadly force, the parties both rely on that case law as controlling here, where correctional officers, not police officers, used deadly force.  Like noncustodial law enforcement officers, correctional officers are subject to reasonable force restrictions.  (C.f., *In re Riddle* (1962) 57 Cal.2d 848, 852 ["custodial officers may use reasonable force upon a prisoner to enforce proper prison regulations"].)

"Also, as the nation's high court has observed, '[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " (*Hayes*, *supra*, 57 Cal.4th at p. 632, quoting *Graham v. Connor* (1989) 490 U.S. 386, 396.) " ' "We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." [Citation.]' [Citation.] Placing the burden of proof on the plaintiff to establish that an officer's use of force was unreasonable 'gives the police appropriate maneuvering room in which to make such judgments free from the need to justify every action in a court of law.' " (*Brown*, at pp. 527-528.)

Because of the deference given to law enforcement officers in making tactical decisions in exigent circumstances, " '[a]s long as an officer's conduct falls within the *range of conduct that is reasonable under the circumstances*, there is no requirement that he or she choose the "most reasonable" action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence.' [Citation.] . . . Law enforcement personnel have a degree of discretion as to how they choose to address a particular situation." (*Hayes*, *supra*, 57 Cal.4th at p. 632, italics added.)

The issue of whether a law enforcement officer acted within the range of reasonable conduct in using deadly force may, when appropriate, be decided on summary judgment. "Summary judgment is appropriate when the trial court determines that,

9

viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence." (*Hayes*, *supra*, 57 Cal.4th at p. 632.)  When, in considering a summary judgment motion, the trial court determines that a "decision to use deadly force and . . . use of deadly force were *objectively reasonable under the circumstances*," judgment may be granted for the defendant.  (*Brown*, *supra*, 171 Cal.App.4th at p. 534, italics added [affirming summary judgment in negligence claim against police officers who used deadly force that inadvertently injured a bystander in a nearby building, as the actions were objectively reasonable under the circumstances].)  Only "[i]f the circumstances permit a reasonable doubt whether defendants' conduct violated the boundaries of due care, [must] the doubt . . . be resolved as an issue of fact by the jury rather than of law by the court."  (*Brummett v. County of Sacramento* (1978) 21 Cal.3d 880, 887.)[6]

---

[6]     Arrendell cites *Giraldo v. California Department of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 231, 250, when discussing the applicable duty of care.  However, *Giraldo* is inapposite under the facts of this case.  *Giraldo* concerned a lawsuit by a transgender prisoner who challenged implementation of " 'prison policies that place transgender inmates, such as [plaintiff], who have the physical appearance of women, in the male inmate population without any meaningful precaution to the obvious risk of sexual assault to them,' " and which allegedly led to the plaintiff being beaten and raped by a cellmate.  (*Id*. at p. 237.)  *Giraldo* held that "there is a special relationship between jailer and prisoner, imposing on the former a duty of care to the latter."  (*Id*. at p. 250.)  That duty arises from the fact that prisoners are "vulnerable" and "dependent," with the "relationship between them . . . protective by nature, such that the jailer has control over the prisoner, who is deprived of the normal opportunity to protect himself from harm inflicted by others."  (*Ibid*.)  The special duty of a correctional officer to protect prisoners from other inmates is not applicable here because Arrendell was not harmed by another inmate.  The injury to Arrendell resulted from an inadvertent ricochet of a bullet when officers were acting on their duty to protect another inmate, Bivens, from being harmed by fellow inmates.

B.     *Perez, Din and Lam Established as a Matter of Law That the Decision to Use Deadly Force Was Objectively Reasonable Under the Circumstances*

Arrendell contends that in responding to defendants' summary judgment motion, he established a material factual dispute about whether defendants acted within the range of reasonable conduct by responding with deadly force to the prison yard fight. As we will discuss, under any version of the facts supported by the record, the defendants' conduct was objectively reasonable.

As we have explained, the fundamental applicable principle is that the "use of deadly force is reasonable if ' " 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.' " ' " (*Brown*, *supra*, 171 Cal.App.4th at p. 528.) Here, it is undisputed that Bivens was being stabbed, was bleeding profusely, and Perez believed that Bivens would be killed if she did not act immediately to stop the fight. This situation satisfies the criteria for use of deadly force.

Arrendell's main dispute is not with whether Bivens's life was in danger.[7] Instead, Arrendell criticizes the use of deadly force because he believes that nonlethal measures could have been just as effective without putting bystanders in danger of suffering injury

---

[7]     We note, however, that Arrendell tries to distinguish one of the applicable cases cited by the People, *Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675, by arguing that unlike in this case, in *Lopez* the officer's unintended shooting of a person behind a closed door was reasonable based on "the exigency of the circumstances." (*Id.* at p. 690.) If Arrendell means to argue that no exigent circumstances existed here, we disagree. As we have explained, there was evidence that Rios was stabbing Bivens, and Perez believed that Bivens would soon be killed if she did not quickly stop the fight.

11

from a ricocheting bullet. However, Arrendell overlooks two important points. First, case law gives officers wide discretion in exigent circumstances to determine how to respond to a situation. As we have explained, " 'there is no requirement that [the officer] choose the "most reasonable" action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence.' " (*Hayes*, *supra*, 57 Cal.4th at p. 632.) Second, the evidence shows that the nonlethal measures were not effective at stopping the fight. Rios was still stabbing Bivens even after Perez fired three nonlethal rounds and the other officers threw several O.C. grenades at the fighting inmates. Based on those facts, Arrendell's suggestion that the officers could have stopped the fight using nonlethal measures "is pure conjecture, and does not establish that [the officers'] actual response to the situation was unreasonable." (*Brown*, *supra*, 171 Cal.App.4th at p. 537.)

In an attempt to establish that the officers' response with deadly force was not within the range of reasonable conduct under the circumstances, Arrendell contends that it was not reasonable for Perez to shoot the rifle a third time because she "herself admitted that she could not accurately hit the inmates." According to Arrendell, Perez "knew her aim was not good enough to reliably hit the moving people at whom she was firing" and that "[i]t was undisputed that . . . Perez did not have a clear shot at the three inmates that were fighting . . . ." Those assertions have no support in the record, as there is no evidence of Perez ever admitting that she could not accurately hit the inmates. On the contrary, Perez stated in her deposition testimony that she shot the rifle on occasions when she *did* have a clear shot at her target. She chose to use a wood block round, not

12

the rifle, during the interval when the subjects were moving around too much to allow her to aim accurately.

In a similar argument, Arrendell contends that Perez "kn[e]w from missing with the less-lethal rounds that she [could not] accurately hit the person at whom she [was] aiming." (Italics omitted.) Arrendell contends that "it is undisputed that the tower officer was unable to hit the fighting inmates . . . ." That assertion is not supported by the record, as Arrendell did *not* miss with all of the nonlethal rounds. As we have explained, according to Perez, she missed with the initial direct impact round and with the first wood block round, but she hit Martinez with the second wood block round. Arrendell contends that the second wood block round missed its mark because it hit the ground *near* the inmates. However, as Perez explained in her deposition testimony, she was not aiming directly at the inmates. Instead, because the wood block round is designed to disperse and hit people after striking the ground in front of them, she aimed three feet in front of the inmates. After the wood block round hit where Perez aimed, it dispersed and struck Martinez. Similarly, under the facts as described in Arrendell's deposition, Perez hit Martinez with one of the nonlethal rounds, which was either the direct impact round or the wood block round, depending on which part of Arrendell's deposition is consulted. Under either of these factual scenarios, there is no basis for a finding that Perez knew she could not hit a target accurately with a shot from the tower.

Arrendell also contends that Perez should have continued to use nonlethal rounds because she purportedly had success with the wood block round in getting the inmates to desist. Arrendell specifically argues that Perez should not have used lethal force because

13

the nonlethal force "was effective in getting the inmates to 'prone out' or lay prone on the floor and stop fighting." We reject this argument for two reasons. First, under Arrendell's version of the facts as described in his deposition testimony, the nonlethal rounds did *not* cause the inmates to desist, as Martinez returned to the fight after briefly going to the ground when hit with a nonlethal round. Next, under the officers' version of events, Perez fired three nonlethal rounds, with a wood block round finally getting Martinez to stop fighting, but the nonlethal measures did not stop Rios, who continued to stab Bivens. As exigent circumstances existed based on the immediate threat to Bivens's life, it was objectively reasonable for Perez to switch to deadly force when the nonlethal measures had not stopped Rios from stabbing Bivens.

Turning his attention to the officers on the ground — Din and Lam — Arrendell contends that they did not act reasonably because they did not physically intervene to stop the fight, which contributed to Perez's ultimate decision to use deadly force.[8] As an initial matter, we note that according to Arrendell's version of events, an officer *did* physically intervene by straddling the three assailants and threatening to use his baton on them, but then desisting at Lam's orders. Assuming that Arrendell is arguing either that this physical intervention was not sufficiently extensive, or that there was no physical

---

[8]    We consider the reasonableness of Din's and Lam's conduct as part of the inquiry into whether it was reasonable, under the totality of the circumstances, for the officers to use deadly force. As our Supreme Court has recently clarified, officers' "preshooting conduct should not be considered in isolation" as a possible separate breach of duty. (*Hayes*, *supra*, 57 Cal.4th at p. 632.) "Rather, it should be considered in relation to the question whether the officers' ultimate use of deadly force was reasonable." (*Ibid.*)

14

intervention at all, as the officers testified, we reject the argument and conclude that the officers' conduct was well within the range of reasonable conduct. The officers on the ground did not simply stand by without doing anything. Instead, they deployed several O.C. grenades at the feet of the fighting inmates and repeatedly ordered the inmates to stop fighting. Further, the officers are trained to avoid physical combat with inmates who possess weapons because the inmates may turn the weapons on them.[9] Under the circumstances here where (1) exigent circumstances existed; (2) Perez was in the tower, with both nonlethal and lethal measures available to her; and (3) the officers were trained not to engage armed inmates, it was objectively reasonable for the officers on the ground to employ O.C. grenades rather than engaging in a physical confrontation with armed inmates.[10]

---

[9] Arrendell contends that Perez "specifically told Arrendell that the officers on the ground should have approached the inmates and it was only when they failed to break up the fight that she felt she had to use deadly force." The record does not support that assertion. Arrendell testified in his deposition that he spoke to Perez at some point after the incident, but in the excerpts contained in the record, Arrendell did not describe a discussion with Perez on that subject. Perez testified in her deposition that during the fight she wished that the officers on the ground could have done something to stop the fight, but in her deposition testimony she quickly clarified that the only options available to them were to throw the O.C. grenades.

[10] In a related contention, Arrendell states that all three of the fighting inmates went to the ground, at which point the officers on the ground should have moved in to physically restrain them. This argument fails because its premise is faulty. There is no evidence that all of the inmates were on the ground and in a position to be physically restrained at any point during the fight. According to all of the witnesses, the inmates continued to actively fight throughout the entire incident, with only Martinez stopping (either briefly or permanently). There was accordingly no good opportunity to physically restrain the inmates that did not involve risk to the officers. If Arrendell means to argue that the officers should have restrained Martinez when he went down to the ground, it

15

Finally, Arrendell argues that factual disputes exist on issues that are important in establishing whether the officers' conduct was within the range of reasonable conduct. Specifically, the following factual disputes exist: (1) whether Martinez stopped fighting and threw away his weapon after being hit with a nonlethal round, or only temporarily stopped fighting; (2) whether the inmates were ever fighting on the ground, as Din, Lam and Arrendell recalled, or fighting while standing, as Perez remembered; and (3) whether an officer straddled the fighting inmates on the ground and raised a baton, but then moved away at Lam's orders.[11]

Regardless of how a finder of fact were to resolve these three factual disputes, the officers' approach would still be within the range of reasonable conduct as a matter of law. First, regardless of whether Martinez rejoined the fight after being hit with a nonlethal round, the undisputed fact remains that Rios was still stabbing Bivens, and

---

was within the range of reasonable conduct for the officer to have decided not to do so. Assuming that, as Arrendell described, Martinez only temporarily stopped fighting and still had his weapon, it was reasonable for the officers to stand back from Martinez at that point, as Martinez might turn his weapon on them. Restraining Martinez would also have put the officers in the danger zone of any rounds fired by Perez to control Rios, who was still actively stabbing Bivens. If, on the other hand, events unfolded as the officers described, with Martinez going to the ground and discontinuing the fight after throwing away his weapon, it would not have been important for the officers to immediately restrain Martinez.

[11]     Arrendell contends that there is also a factual dispute about whether all of the fighting inmates went prone to the ground and could have been handcuffed after the wood block rounds were deployed. As we have explained, there is no evidence in the record supporting Arrendell's scenario. Although witnesses described the fight as transitioning to the ground rather than with the inmates standing up, and Martinez going to the ground after being hit with a nonlethal round, no witness described *all* of the inmates as taking a prone position during which they stopped fighting and could have been handcuffed prior to Perez firing the third lethal round.

16

Perez believed that Bivens would be killed if she did not do something quickly. Under either scenario, the remaining threat posed by Rios justified the use of deadly force. Second, regardless of whether the inmates fought on the ground or standing up, it is undisputed that nonlethal measures had not stopped Rios from stabbing Bivens, justifying Perez's resort to deadly force to try to stop the attack. Third, even if, as Arrendell testified, an officer with a drawn baton straddled the fighting inmates at some point and then desisted at the direction of Lam, the officers' actions would still be within the range of reasonable conduct. There is no indication in Arrendell's testimony that the officer straddling the inmates was making any progress in stopping the fighting, and, as we have described, officers are trained to stay out of a physical altercation with armed inmates because the officers may be harmed. Further, with the officer straddling the inmates, Perez would be prevented from taking a shot at the fighting inmates to get them to stop fighting without putting the officer in danger. Based on all those considerations, it would be within the range of reasonable conduct for the officer straddling the inmates to back off and allow Perez to handle the situation by shooting rounds from the tower.

In sum, we conclude that under any factual scenario of how the incident occurred, the officers' use of deadly force was objectively reasonable under the circumstances. Therefore, the trial court properly granted summary judgment in favor of defendants.

DISPOSITION

The judgment is affirmed.


                                                                IRION, J.

WE CONCUR:


NARES, Acting P. J.


HALLER, J.