[No. B088915. Second Dist., Div. Five. July 11, 1996.]

SABRINA MARTINEZ et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

338

**COUNSEL**

Moreno, Becerra & Guerrero, Danilo J. Becerra and Arnoldo Casillas for Plaintiffs and Appellants.

De Witt W. Clinton, County Counsel, S. Robert Ambrose, Assistant County Counsel, Dennis M. Gonzalez, Principal Deputy County Counsel, Manning, Marder & Wolfe and Robert S. Wolfe for Defendants and Respondents.

## OPINION

**GODOY PEREZ, J.**—Plaintiffs Sabrina Martinez and Maria Canales appeal the summary judgment entered for defendants the County of Los Angeles, the county's sheriff's department, Sheriff Sherman Block and Deputies Jerry Gleason and Thomas Gibson. For the reasons set forth below, we affirm that judgment.

### FACTS AND PROCEDURAL HISTORY

Shortly before 9 p.m. on November 24, 1992, an anonymous tipster phoned the Los Angeles County Sheriff's Department (the department) to report that an Hispanic man high on phencyclidine (PCP) was running around the intersection of Olympic Boulevard and McBride with a knife in his hand. Deputies Jerry Gleason and Thomas Gibson were on patrol nearby and answered the call.

When the deputies arrived in the area, they did not immediately see a man with a knife. Instead, they saw two juveniles spray-painting graffiti on a nearby Lucky's supermarket and arrested them. The taggers were handcuffed and the deputies were talking with the owner of the store when they heard shouting and saw Luis Martinez (Martinez) standing on the south side of Olympic Boulevard with a knife in his hand. A photo of the knife is in the record. It is a carving-type kitchen knife with an eight-inch blade and a four-inch wooden handle.

Martinez yelled, " 'Over here. Here I am, I'm the one you want. I'm the one you're looking for.' " Martinez crossed the street and came toward the deputies, seemingly oblivious to the traffic around him. As a result, motorists heading down Olympic were forced to brake or swerve. Gleason placed one of the taggers in the back of the patrol car and Gibson placed the other behind himself on the curb.

Martinez walked toward the deputies in a motion described by the deputies and other eyewitnesses as slow, stiff, rigid, deliberate, lethargic and mechanical. All who saw Martinez, including the deputies and eyewitnesses Blanca Gutierrez and Alonzo Ramirez, said Martinez appeared to be under the influence of drugs or alcohol. Deputies Gleason and Gibson believed, based on Martinez's body movements and irrational behavior, combined with their training, experience and knowledge, that Martinez was under the

influence of PCP. Both deputies were aware that a person on PCP may have extraordinary strength and a high tolerance to pain.[1]

Martinez kept walking toward the deputies, holding the knife in a variety of positions ranging from waist high with the blade pointed skyward to by his head above his shoulders. Gibson testified at his deposition that Martinez mostly kept the knife in the latter position. Both deputies drew their pistols and told Martinez to stop, drop the knife and talk about his problems. Martinez kept advancing with the knife in his hands, shouting, " 'Go ahead, kill me or I'm going to kill you' " and " 'Shoot me. Shoot me.' "

Blanca Gutierrez heard the deputies tell Martinez several times to drop the knife. Another eyewitness, Rayvon Delone Hale, heard Gibson and Gleason tell Martinez to drop the knife at least 14 times. The deputies kept retreating as Martinez advanced, repeating their admonitions that he drop the knife. As the deputies retreated, they came closer to the supermarket. Blanca Gutierrez said Martinez walked toward the deputies "with a macho-type look and it appeared as if he wanted to stab them."

When Martinez got to within 10 or 15 feet of the deputies, they each fired their pistols. Gibson initially fired two rounds and Gleason just one. Gibson testified that Martinez looked down for a second, looked back at him and tried to take another step forward. In response, Gibson fired three more shots. Gleason also saw Martinez flinch and begin to take another step, but did not fire any more shots because he was still "sizing up the situation." Alonzo Ramirez said the deputies shot Martinez "once or twice while standing and several times after he went down." Rayvon Delone Hale stated in his declaration that the deputies were still shooting as Martinez "was going down or . . . was down on the ground already. . . ."

Deputy Gibson fired because Martinez maintained eye contact with him, could not be reasoned with and kept coming. Gibson testified: "In my opinion, there was no other alternative because we had the juveniles we had handcuffed on the curb, we had the store owner, there was other people around at that point in time when he made that final movement. I felt that he was actually going to go after us. And I have the responsibility to protect myself, my partner, and the citizens. I felt there was no other alternative for me." Deputy Gleason fired for the same reasons.

An ambulance was called and Martinez was rushed to the hospital, but he died that night. His mother, plaintiff and appellant Maria Canales, and his daughter, plaintiff and appellant Sabrina Martinez appearing by and through

---

[1]The coroner's toxicology report showed that Martinez in fact had PCP in his system.

her guardian ad litem, Nicole Keller, sued the department, the County of Los Angeles, Sheriff Sherman Block, Gleason and Gibson for Martinez's death.[2] The complaint stated three causes of action: two for federal civil rights violations under 42 United States Code section 1983, one against the county defendants and one against Gibson and Gleason; and one for wrongful death under state common law principles against respondents for the shooting death of Martinez.

Respondents later moved for summary judgment on several grounds, including that the shooting was reasonable and justified, barring the entire complaint under federal and California immunity principles. On October 13, 1994, the trial court granted summary judgment on that basis and judgment was entered October 31, 1994. This appeal followed. Because we affirm the judgment on the same immunity ground as did the trial court, we need not reach the other grounds for affirmance raised by respondents.

### STANDARD OF REVIEW

Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) ■ In reviewing an order granting summary judgment, we must assume the role of the trial court and redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party's papers. (*Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 549 [5 Cal.Rptr.2d 674].) The declarations of the party opposing summary judgment, however, are liberally construed to determine the existence of triable issues of fact. (*Sosinsky* v. *Grant* (1992) 6 Cal.App.4th 1548, 1556 [8 Cal.Rptr.2d 552].) All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment. (*Ibid.*)

While the appellate court must review a summary judgment motion by the same standards as the trial court, it must independently determine as a matter of law the construction and effect of the facts presented. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1510-1511, 1513-1515 [285 Cal.Rptr. 385].)

■ Recent amendments to the summary judgment statute have changed the burden of proof. A defendant moving for summary judgment meets his burden of proof of showing that a cause of action has no merit if that party

---

[2]Martinez, Canales and Keller will be collectively referred to as "appellants." The County of Los Angeles, the department, and Sheriff Block will sometimes be referred to collectively as "the county defendants." Gibson, Gleason and the county defendants will sometimes be referred to collectively as "respondents." Gibson and Gleason were originally named as Doe defendants, then later added to the complaint by amendment.

shows that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to the action. (Code Civ. Proc., § 437c, subd. (o)(2).) Once the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or defense. In doing so, the plaintiff cannot rely on the mere allegations or denial of his pleadings, "but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (*Ibid.*; see *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 590 [37 Cal.Rptr.2d 653].)

## DISCUSSION

### 1. *Appellants' Civil Rights Claim Is Barred by the Deputies' Qualified Immunity From Suit*

▮▮ Appellants' second and third causes of action are brought under 42 United States Code section 1983 (hereafter section 1983), which provides civil redress for deprivation of constitutional rights. It was enacted " 'to provide protection to those persons wronged by the misuse of power.' [Citation.]" (*Wilson* v. *Meeks* (10th Cir. 1995) 52 F.3d 1547, 1552, hereafter *Wilson.*) Section 1983 creates no substantive civil rights, however, only a procedural means for their enforcement. (*Wilson* v. *Meeks, supra,* 52 F.3d at p. 1552.)[3] Since it is a federally derived cause of action, federal law governs. (*Elene H.* v. *County of Los Angeles* (1990) 220 Cal.App.3d 1445, 1451 [269 Cal.Rptr. 783].)

▮ "Qualified immunity is an affirmative defense against section 1983 claims. [Citation.] Its purpose is to shield public officials 'from undue interference with their duties and from potentially disabling threats of liability.' [Citation.] The defense provides immunity from suit, not merely from liability. [Citation.] Its purpose is to spare defendants the burden of going forward with trial. [Citation.]" (*Wilson, supra,* 52 F.3d at p. 1552.) Because it is an immunity from suit, not just a mere defense to liability, it is important to resolve immunity questions at the earliest possible stage in litigation. (*Hunter* v. *Bryant* (1991) 502 U.S. 224, 227 [116 L.Ed.2d 589, 595, 112 S.Ct. 534]; accord, *Elene H.* v. *County of Los Angeles, supra,* 220 Cal.App.3d at p. 1453.) Immunity should ordinarily be resolved by the court, not a jury. (*Hunter* v. *Bryant, supra,* 502 U.S. at p. 228 [116 L.Ed.2d at pp. 595-596].)

---

[3] Section 1983 provides, in pertinent part, that: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

█ Appellants contend that respondents are liable in part because Deputies Gibson and Gleason used excessive force in trying to detain and subdue Martinez. This contention is based on the following: (1) respondents' summary judgment motion claimed the deputies shot Martinez when he lunged at them, but there is no competent evidence to support that claim; (2) eyewitness testimony showed that Martinez moved slowly and lurchingly, with the knife held either waist high at his side or with the blade pointed toward the sky, not in an "attack position"; (3) eyewitness declarations stating Martinez was not an immediate threat to the deputies' safety; (4) the declaration of a police training expert that the deputies shot prematurely and should have used different tactics and less forceful alternatives to subdue Martinez; and (5) that the county respondents are liable for failing to properly train and discipline their deputies in regard to the proper use of force and by failing to provide and train their officers in the use of less forceful alternatives.

█ Such excessive force claims are analyzed under the Fourth Amendment and its "reasonableness" standard and the proper inquiry focuses upon whether the deputies acted reasonably in shooting Martinez. (*Graham* v. *Connor* (1989) 490 U.S. 386, 395 [104 L.Ed.2d 443, 454-455, 109 S.Ct. 1865], hereafter *Graham.*) The test of reasonableness in this context is an objective one, viewed from the vantage of a reasonable officer on the scene. It is also highly deferential to the police officer's need to protect himself and others: "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. [Citation.] . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. [¶] [T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. [Citations.]" (*Graham, supra,* 490 U.S. at pp. 396-397 [104 L.Ed.2d at pp. 455-456].)

". . . Thus, under *Graham,* we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." (*Smith* v. *Freland* (6th Cir. 1992) 954 F.2d 343, 347.)

The Supreme Court's definition of reasonableness is therefore "comparatively generous to the police in cases where potential danger, emergency

conditions or other exigent circumstances are present." (*Roy* v. *Inhabitants of City of Lewiston* (1st Cir. 1994) 42 F.3d 691, 695, hereafter *Roy*.) In effect, "the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases. . . ." (*Ibid.*)

■ With these principles in mind, the undisputed facts of this case properly call for invocation of the qualified immunity doctrine. The deputies responded to a call that an Hispanic man high on PCP was walking about brandishing a knife. Martinez, who every witness agreed seemed to be high on alcohol and/or drugs, crossed a busy intersection in complete disregard to oncoming traffic, shouting at the deputies that he was the one they were looking for. The knife, although moved about in different positions, was in his hand at all times. Martinez kept coming toward the deputies despite their attempts to talk to Martinez and their repeated admonitions that he drop the knife. The deputies retreated as Martinez advanced, with Martinez shouting that they should shoot him or he would kill them. When Martinez closed to within 10 or 15 feet of the deputies, he was also nearing the handcuffed taggers, the store owner and others. At that point, when Martinez kept coming, the deputies fired.

The courts have routinely characterized as reasonable police shootings which occurred under such circumstances. In *Rhodes* v. *McDannel* (6th Cir. 1991) 945 F.2d 117, the officers responded to a report that a woman was being chased around her house by a man with a machete. The woman led the officers into the house and then into the living room, where they encountered the machete-wielding suspect. The suspect advanced toward the woman and the officers. The officers warned the suspect several times to drop the machete but he kept coming. When the suspect got within four to six feet of the officers, they shot and killed him. On these facts, the appellate court held that the shooting was objectively reasonable and affirmed the district court's grant of summary judgment for the officers and their department in a section 1983 action brought by the suspect's heirs. (945 F.2d at p. 120.)

Summary judgment for the defendants in *Roy*, *supra*, 42 F.3d 691, was also affirmed for the same reason. Two police officers responded to a domestic violence report at Roy's home. Mrs. Roy told the officers that her husband was armed with two knives and had threatened to use them. The officers found Roy passed out drunk in his backyard, roused him, and began to arrest him. Roy went into his house and returned with a steak knife in each hand, following after his screaming wife. The officers drew their guns and ordered Roy to put down the knives. He advanced, flailing his arms while keeping hold of the knives. The officers retreated down a steep hill,

repeated their warnings, and made some attempt to distract and disarm Roy. When Roy made a kicking/lunging motion toward the officers, he was shot and badly injured. In holding that the shooting was reasonable, the court said: "Roy was armed; he apparently tried to kick and strike at the officers; he disobeyed repeated instructions to put down the weapons; and the officers had other reasons, already described, for thinking him capable of assault." (*Roy*, *supra*, 42 F.3d at p. 696.)

■ Thus, "an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack. In these circumstances, the Courts cannot ask an officer to hold fire in order to ascertain whether the suspect will, in fact, injure or murder the officer. The high numbers of officer mortalities in recent years illustrate the unreasonableness of such a notion." (*Reynolds* v. *County of San Diego* (S.D.Cal. 1994) 858 F.Supp. 1064, 1072, hereafter *Reynolds*.)

■ The fact that Martinez walked slowly and did not lunge at Deputies Gibson and Gleason does not compel a different result. The machete-wielding suspect in *Rhodes* v. *McDannel*, *supra*, 945 F.2d 117, did not lunge. Instead, just as occurred here, he was justifiably and reasonably shot when he kept advancing despite several warnings that he stop. In any event, case-by-case factual differences prove no more than that each case has its own facts. (*McLenagan* v. *Karnes* (4th Cir. 1994) 27 F.3d 1002, 1007.)

The same is true for appellants' assertion that Martinez merely held the knife at his waist or with the blade pointed skyward. This did not render Martinez any less of a threat, given his stated intention to kill the deputies and his steady advance despite repeated warnings that he stop. On these facts, the shooting was still objectively reasonable. (See *Wilson*, *supra*, 52 F.3d at p. 1553 [even if decedent was holding the gun in a "surrender" position, ". . . it is hard to imagine that pointing a .357 magnum in any direction would not cause a reasonable police officer to fear for someone's life—if not his own, then the life of a bystander or the gunman himself"].) "Shooting a man who has told you, in effect, that he is going to use deadly force against you and then moves toward you as if to do so is unquestionably an act of self-defense even if . . . the man is attempting 'suicide by police.' " (*Plakas* v. *Drinski* (7th Cir. 1994) 19 F.3d 1143, 1146, hereafter *Plakas*.)

Based on the decision in *Hopkins* v. *Andaya* (9th Cir. 1992) 958 F.2d 881, hereafter *Hopkins,* appellants also contend that triable factual issues exist as

to the reasonableness of Deputy Gibson's second volley of gunfire given eyewitness declarations which stated Martinez was shot while on the ground. The decedent in *Hopkins* was first shot six times after assaulting an Oakland police officer with the officer's own baton. The officer then retreated across the street, called for backup and reloaded his gun. The suspect pursued the officer across the street and the officer shot four more times, killing him. He had already been shot six times, was unarmed and was some distance from the officer when the fatal shots were fired. On those facts, the Ninth Circuit could not say as a matter of law that the suspect "posed a threat of serious physical harm" and declined to find the shooting reasonable as a matter of law. (*Id.* at p. 887.)

The situation here was far different. Gibson had already fired two shots but testified that Martinez paused and began to take another step forward. He believed Martinez was high on PCP and knew that PCP users become oblivious to pain, at the same time gaining extraordinary strength.[4] Though Hale declared that Martinez was shot either while down or while going down, and Ramirez testified that Martinez was shot while down, absent from their statements is anything to contradict the deputies' statements that Gibson fired again when Martinez started to take another step forward. (Code Civ. Proc., § 437c, subd. (o)(2) [plaintiff opposing summary judgment motion must set forth specific facts to raise a triable issue].)

Because it is undisputed that Gibson's second volley of gunfire came when Martinez tried to continue his forward progress, the most which can be inferred from the statements of Hale and Ramirez is that Gibson fired three more shots when Martinez stepped forward, but Martinez fell to the ground as Gibson fired. We find these facts analogous to those in *O'Neal* v. *DeKalb County, GA.* (11th Cir. 1988) 850 F.2d 653 (hereafter *O'Neal*).

The police officers in *O'Neal* were sued under section 1983 for the shooting death of a man who went on a stabbing rampage inside a hospital. After being warned by the officers to drop his knife, the decedent rushed forward with the knife raised. The officers fired their guns, but instead of falling to the ground, the suspect twisted away from the force of the shots, still holding the knife over his head. One of the officers fired a second shot

---

[4]The potency of PCP and its dangerous effects on those who take it have been recognized by ample case authority. (See *People* v. *Profit* (1986) 183 Cal.App.3d 849, 871-872 [229 Cal.Rptr. 148], and cases cited therein [" '. . . PCP anesthetizes the body to a point where the user feels "absolutely zero pain." A person who uses PCP may thus appear to have "super-human strength" because his or her body is immune to pain which would otherwise inhibit activities.' [Citations.]"].) Gibson and Gleason were both aware of these effects.

immediately after his first, which struck the man in the back and brought him to the ground.

After easily concluding that the first volley of shots was a reasonable response to the knife-wielding man's advance, the court also held the second shot was reasonable and justified since the second shot was fired while the suspect was still on his feet, holding the knife and spinning away from the force of the first shots. Those facts convinced the court that the officer's second shot "was part of his initial reaction to O'Neal's attempt to stab him, and not, as the plaintiffs would have us believe, a brutal, gratuitous use of force against a visibly disabled suspect. Viewed as part of his initial reaction to O'Neal's attack, and in light of the unusual circumstances facing the officers that evening, [the officer's] firing of two shots in rapid succession in an attempt to guarantee O'Neal's apprehension did not constitute excessive force." (*O'Neal, supra*, 850 F.2d at p. 657, fns. omitted.)

Under *O'Neal*, Deputy Gibson acted reasonably in firing again when Martinez, apparently high on PCP, simply flinched after being shot and began to take another step forward. That Martinez fell and was on the ground while this second burst of gunfire continued does not make Gibson's actions unreasonable since all three shots were part of his initial reaction to Martinez's apparent continued advance. (*O'Neal, supra*, 850 F.2d at p. 657.)

Appellants also place great reliance on the declaration of their police expert, Frank Saunders, a former Santa Monica police officer and field training officer now working as a private investigator and law enforcement consultant. Saunders opined that Deputies Gibson and Gleason were "totally premature" in shooting Martinez when they did because they knew they might be encountering a drug-crazed, knife-wielding man and should have prepared themselves to use less forceful alternatives. These should have included "additional manpower and related emergency-type equipment (i.e.: taser; containment net; mace; or other tear gas equipment; pepper gas, etc.), *before* it would be needed." (Original italics.) The deputies' failure to do so and instead shoot Martinez was not objectively reasonable and "fell to a level of gross negligence at the very least."[5]

As for the county defendants, Saunders opined that their failure to provide such alternatives to their deputies and train them in their use "rises to a level of deliberate indifference to the misuse of deadly force in the department." (Italics omitted.)

---

[5]At the time of the shooting, the deputies were only armed with their batons, pistols and a shotgun. Pepper spray has since been issued to some but not all deputies and tasers are carried by field sergeants or supervisors.

When the only surviving witness to a police shooting is the officer himself, the courts have awarded summary judgment only with particular care following a critical assessment of, among others, expert opinions to consider whether the officer's testimony could be reasonably rejected at trial. (*Plakas, supra,* 19 F.3d at pp. 1146-1147; *Scott* v. *Henrich* (9th Cir. 1994) 39 F.3d 912, 915, hereafter *Scott.*) The federal courts have been highly critical, however, when an expert offers legal conclusions as to ultimate facts in the guise of an expert opinion. (*Berry* v. *City of Detroit* (6th Cir. 1994) 25 F.3d 1342, 1353-1354; *Hygh* v. *Jacobs* (2d Cir. 1992) 961 F.2d 359, 363-365.) Saunders's declaration falls into the latter category by inappropriately drawing legal conclusions concerning such matters as the objective reasonableness of the deputies' conduct and the county defendants' "deliberate indifference" to misuse of force. (*Ibid.*) To the extent it does so, we reject that declaration.

Further, the essence of Saunders's declaration is that less forceful, alternative measures should have been used to subdue Martinez. "There is no precedent in [any federal appellate court circuit] which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used. There are, however, cases which support the assertion that, where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first. . . ." (*Plakas, supra,* 19 F.3d at p. 1148, fn. omitted.) This holds true in the Ninth Circuit as well. (*Scott, supra,* 39 F.3d at p. 915 [proper inquiry is whether officers acted reasonably, not whether other less intrusive alternatives were available].) Saunders's opinion that less forceful means should have first been employed is therefore meaningless given our conclusion that the shooting was reasonable.[6]

■ We also reject appellants' reliance on the declarations of Hale and Ramirez that the shooting was not reasonable since they did not believe Martinez posed a threat to anyone. Not only do their opinions fly in the face of the undisputed facts, they are entirely irrelevant, since the focus is on the viewpoint of the reasonable police officer (*Graham, supra,* 490 U.S. at pp. 396-397 [104 L.Ed.2d at pp. 455-456]), not the viewpoint of others.

■ Finally, since we hold there was no constitutional violation by Deputies Gibson and Gleason, the county defendants cannot be liable for

---

[6]Appellants also cite *Hopkins, supra,* 958 F.2d 881, for the proposition that the failure to use less forceful alternatives might make a police shooting unreasonable. In finding the police officer's second shooting unreasonable, the *Hopkins* court did say the officer should have considered alternative means before shooting a man who was still some distance away and had already been wounded by gunfire. (*Id.* at p. 887.) That language from *Hopkins* has been rejected as requiring officers to use less deadly alternatives even when deadly force is reasonable and justified. (*Schulz* v. *Long* (8th Cir. 1995) 44 F.3d 643, 649, fn. 5.) Moreover, it has been implicitly overruled by the Ninth Circuit in *Scott, supra,* 39 F.3d at page 915.

having failed to adequately train or supervise their deputies. (*Scott, supra,* 39 F.3d at p. 916.)

## 2. *The State Law Wrongful Death Claim Is Barred by State Law Immunity Principles*

 Appellants' state law wrongful death claim against respondents is based on allegations that Deputies Gibson and Gleason used excessive force and acted unreasonably in shooting Martinez.[7]

Under Penal Code section 196, a police officer who kills someone has committed a justifiable homicide if the homicide was "necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty" or when "necessarily committed in retaking felons who have been rescued or who have escaped . . . and who are fleeing from justice or resisting such arrest." (Pen. Code, § 196, subds. 2, 3.) There can be no civil liability under California law as the result of a justifiable homicide. (*Reynolds, supra,* 858 F.Supp. at pp. 1074-1075; *Gilmore* v. *Superior Court* (1991) 230 Cal.App.3d 416, 420-423 [281 Cal.Rptr. 343].)

The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances "reasonably create[d] a fear of death or serious bodily harm to the officer or to another." (*Kortum* v. *Alkire* (1977) 69 Cal.App.3d 325, 333 [138 Cal.Rptr. 26]; accord, *Reynolds, supra,* 858 F.Supp. at pp. 1074-1075; *People* v. *Rivera* (1992) 8 Cal.App.4th 1000, 1007 [10 Cal.Rptr.2d 785] [using Fourth Amendment "reasonableness" analysis to determine existence of probable cause for arrest, held that use of attack dog by police officer was justified because the officer "reasonably feared for his safety, and that of others in the area"].) The same is true of Government Code section 820.2, which provides immunity from liability to public employees for their discretionary acts. (*Reynolds, supra,* 858 F.Supp. at pp. 1074-1075.)[8]

Since we have already determined that Deputies Gibson and Gleason acted reasonably in shooting Martinez, his death was justified under Penal

---

[7]This cause of action also alleges that the deputies negligently delayed or prevented the prompt rendition of medical treatment for Martinez. That allegation is not discussed by appellants and we deem it waived. In any event, the uncontradicted evidence shows that the deputies called for paramedics within seconds after Martinez fell to the ground.

[8]Government Code section 820.2 states: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

Code section 196 and appellants' state law wrongful death claim is therefore barred as to them. Because the deputies cannot be liable, there is no basis for respondeat superior liability against the county defendants. (Gov. Code, § 815.2 [public entity not liable for acts of employee if the employee is immune from liability; *Thomas* v. *City of Richmond* (1995) 9 Cal.4th 1154, 1157-1158 [40 Cal.Rptr.2d 442, 892 P.2d 1185]; *Perez* v. *City of Huntington Park* (1992) 7 Cal.App.4th 817, 819-820 [9 Cal.Rptr.2d 258]; *Collins* v. *City and County of San Francisco* (1975) 50 Cal.App.3d 671, 673-674 [123 Cal.Rptr. 525].)

## DISPOSITION

For the reasons stated above, the judgment is affirmed. Respondents to recover their costs on appeal.

Turner, P. J., and Armstrong, J., concurred.