Filed 5/20/26  Cuevas v. City of Tulare CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ROSA CUEVAS,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>CITY OF TULARE, et al.,<br><br>    Defendants and Respondents. | F089929<br><br>(Super. Ct. No. VCU312132)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  David C. Mathias, Judge.

Haddad & Sherwin, Michael J. Haddad and Julia Sherwin, for Plaintiff and Appellant.

Jones-Mayer and Bruce D. Praet for Defendants and Respondents.

-ooOoo-

Quinntin Castro led Tulare Police Department officers on a high-speed chase that ended when his car got stuck in the mud.  Plaintiff Rosa Cuevas was in the front passenger seat.  Castro continued revving the engine, causing the tires to spin.  He ignored officers' commands to stop and to turn off the engine.  A responding officer broke the driver's side window, and another officer put his police dog through the

window.  Castro responding by shooting and hitting the dog and the dog's handler.  The dog died, but the handler survived.  The remaining three officers returned fire, ultimately killing Castro.  During the gunfight, Cuevas was unintentionally hit several times.  She survived, but suffered severe injuries.

Cuevas sued the officers and the City of Tulare for violation of the Tom Bane Civil Rights Act (Civ. Code, § 52.1) (the Bane Act), battery, negligence, and intentional infliction of emotional distress (IIED).  The underlying basis of her claims was that the officers unreasonably used deadly force.  The trial court entered summary judgment for the defendants, concluding the officers acted reasonably, and Cuevas appeals.  We affirm the judgment.

## BACKGROUND

### I.      The subject incident

The following facts are taken from the evidence submitted in connection with defendants' motion for summary judgment.

About two weeks after meeting Castro, Cuevas met up with him and his friend, Cameron Ware, on December 9, 2018, at about 7:00 p.m.  They gave Ware a ride in Cuevas's car, a 4-door Mercury sedan.  Castro drove, Cuevas sat in the front passenger seat, and Ware sat in the back.

Officer Daniel Bradley of the Tulare Police Department watched Castro roll through two stop signs without stopping and make a left turn without signaling.  Bradley followed the car into the driveway of a residence.  He partially pulled into the driveway behind the car to initiate a traffic stop.  He turned on his spotlight and saw three people in the sedan:  the driver, front passenger, and rear passenger.  The officer told dispatch there were three people in the car.  Rather than stopping, Castro fled, driving across several residential lawns before returning to the street.

2.

A high-speed pursuit began, with three more officers joining Bradley: Sergeant Andy Garcia, K-9 Officer Ryan Garcia, and Officer Edward Puente. The officers had their lights and sirens on. Castro drove recklessly, "putting lives and other people in danger." The pursuit continued through downtown Tulare, into residential areas, and eventually into a rural area. It ended after Castro got stuck in a berm of mud on the roadside. Bradley's vehicle also got stuck in the mud on the roadside behind and slightly to the right of the sedan. Moments later, Sergeant Garcia, Officer Garcia, and Puente arrived on scene and formed a semi-circle around the sedan, which was stuck facing the wheat field. Bradley intended to perform a felony stop.[1]

Castro continued revving the engine, which caused the tires to spin and sink further into the mud. Officer Garcia at first saw the wheels spinning forward. Though he never saw the wheels spinning backwards, he heard the engine revving intermittently, which made him think Castro could have been putting the car into reverse. He testified he did not pay attention to the tires and was instead "focused on trying to see the driver." Sergeant Garcia thought Castro was trying to escape. During this time, Cuevas sat with her hands up, looking straight, and waiting for orders from the officers.

Bradley and Sergeant Garcia stood in the "V" of each of their driver's side doors, using their vehicles as cover, and pointed their guns at the Mercury sedan. Puente also got out of his vehicle and pointed his gun at the car. The sedan's windows were tinted and it was dark outside, which prevented the officers from being able to see all occupants even with the headlights and spotlights from the police cars.

Castro continued hitting the gas, and the officers repeatedly shouted at him to stop and turn off the engine. But the engine was so loud that the officers did not believe

---

[1] California Vehicle Code section 2800.2, which criminalizes driving in wanton or reckless disregard for public safety while fleeing an officer, is chargeable as a misdemeanor or felony.

Castro could hear the orders. Sergeant Garcia broke the driver's side window with his baton and retreated to his vehicle to continue giving commands to Castro to turn off the car. Sergeant Garcia was asked in his deposition by plaintiff's counsel if Casto stopped revving the engine "as soon as he broke the window," and Sergeant Garcia replied, "Seems about right, yes."

Officer Garcia testified that he told Sergeant Garcia, "[H]ey, Sarge, if you're able to break that window, I can deploy my dog." The next thing Sergeant Garcia did was break the window, but Sergeant Garcia said nothing to Officer Garcia. Sergeant Garcia testified that he may have talked to Officer Garcia about deploying the dog, but he does not remember the conversation, if it happened.[2] Neither Bradley nor Puente heard anything about the dog being deployed.

After the window was broken, Officer Garcia continued yelling commands. He testified that after Sergeant Garcia broke the window, "the tires intermittently stopped and continued[.]" He feared the sedan could become unstuck at any moment and be used as a weapon against the officers. He told Castro that if he did not "stop the car" he (Officer Garcia) was "going to send the dog." By "stop the car," Officer Garica meant spinning the tires. Officer Garcia repeated this warning to Castro "many times" during the 15 to 30 seconds it took him to walk with his canine partner, Bane, from behind his patrol vehicle to the sedan.

Officer Garcia picked up Bane and put him through the broken window into the car. Within seconds of Officer Garcia putting Bane into the car, he saw that Bane was "focused" on Castro, and he gave the bite command to Bane. As soon as Officer Garcia gave that command, Castro grabbed a gun and fired at least six shots from inside the car.

---

**2** Sergeant Garcia did not affirmatively say that he did not talk with Officer Garcia about deploying the dog.

Bane was shot and killed, and Officer Garcia was hit in his right wrist and chest. Officer Garcia was wearing a bulletproof vest.

The other three officers immediately returned 34 shots into the sedan. Although they aimed for Castro, the officers hit Cuevas several times, severely injuring her. At some point, Castro climbed over the front seat and exited the sedan out of the rear passenger seat. He then fired two more errant shots toward the officers. Castro died at the scene. Ware was uninjured.

After Officer Garcia was hit, he "army crawled" toward the nearest patrol vehicle and took cover behind the left front wheel area. When Castro started shooting, Sergeant Garcia was near the rear driver side window. Sergeant Garcia fired into the "driver's area," where he had seen the muzzle flash from Castro's gun. He could not see Castro while he (Sergeant Garcia) was shooting, but he "shot where [he] saw the muzzle flashes and where the threat was at." He fired to protect Officer Garcia, himself, "and to eliminate the threat." At the time of the shooting, he did not know if there were other people in the car besides the driver. Asked by plaintiff's counsel if he did anything to protect any potential other occupants from stray gunfire, he answered, "I didn't know there was other occupants in that vehicle. My direct concern was the driver's side area. That was the threat that I knew of at the time."

Bradley also heard the shots and saw the flash from Castro's gun come from inside the sedan. He saw Officer Garcia fall, and he fired his shots while aiming "[i]n the back windshield toward the" driver's seat area because that is where the gunshots came from. He knew Bane and Officer Garcia had both been shot and he feared they both may be dying. He fired until the shooting from inside the sedan stopped. Asked by plaintiff's counsel if he did "anything to try to avoid hitting any of the passengers with [his] gunshots," he answered, "No." Asked if he was concerned that the passengers could have been in his line of fire, he said, "At that moment, I wasn't thinking about that."

5.

Puente heard the shots and saw flashes inside the sedan on the driver's side. He heard Officer Garcia yell and saw him fall to the ground. Puente was standing behind the sedan in front of his patrol vehicle. He returned fire while aiming towards the driver's seat since that's where he saw the gunshots and muzzle flashes coming from. He did not know if anyone was in the car besides the driver. He acknowledged that the driver and any passengers could have moved around because of the dog and ensuing gunfire. Asked if he took any precautions for any possible passengers, he said, "I didn't have time to." He also stated, "It was a split-second decision on how many shots I had to fire and that was the decision I made."

## II.     Lawsuit and summary judgment

Cuevas, as a co-plaintiff, originally filed suit in the United States District Court for the Eastern District of California against the City of Tulare, Police Chief Matt Machado, Sergeant Garcia, Officer Garcia, Bradley, and Puente. (*Tuggle, et al. v. City of Tulare* (E.D. Cal. June 29, 2023, case no. 1:19-cv-01525-JLT-SAB) 2023 WL 4273900 at p. 3.) She alleged claims under 42 U.S.C. section 1983 as well as state law claims for wrongful death, negligence, battery, and violation of the Bane Act. (*Ibid.*) The district court granted summary judgment on all federal claims brought by Cuevas on qualified immunity grounds, and the court declined to continue exercising supplemental jurisdiction over her state law claims. (*Id.* at p. 19.) The Ninth Circuit Court of Appeals affirmed the grant of summary judgment on the federal claims. (*Cuevas v. City of Tulare* (9th Cir. 2024) 107 F.4th 894, 896.)

Cuevas then filed suit in state court against the City of Tulare, Sergeant Garcia, Officer Garcia, Bradley, and Puente for violation of the Bane Act, battery, negligence, and IIED. The underlying basis of all the claims is that the officers unreasonably used

deadly force.  The City of Tulare and Officer Garcia cross-complained against Cuevas for negligence.

Defendants moved for summary judgment, arguing that they are entitled to judgment as a matter of law because the officers' use of force in self-defense was objectively reasonable and the evidence does not show that they intentionally used deadly force against Cuevas.  Cuevas opposed the motion, asserting that Officer Garcia's deployment of the dog was unreasonable and escalated the situation into a shooting and that the other three officers acted unreasonably in firing indiscriminately into the car without regard for Cuevas's safety.

The trial court granted summary judgment, concluding that the officers' use of force was reasonable.  The officers shot in response to Castro shooting Officer Garcia and Bane.  Castro was an "active threat" that needed to be stopped.  The sudden, intense situation did not afford the officers time to consider alternatives; the officers had to meet gunfire with gunfire.  As to Officer Garcia's deployment of the police dog, the trial court impliedly found that action to be reasonable.

After the court entered judgment, the City of Tulare and Officer Garcia dismissed their cross-complaint without prejudice.

## DISCUSSION

### I.      Summary judgment principles and standard of review

Summary judgment allows courts "to cut through the parties' pleadings ... to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*); *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.)  Summary judgment is appropriate only "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

(Code Civ. Proc., § 437c, subd. (c).)[3]  A defendant's motion for summary judgment must show "that one or more elements of the cause of action … cannot be established, or that there is a complete defense to the cause of action."  (*Id.*, subd. (p)(2).)  When a "defendant does so, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists[.]"  (*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 342 (*Martinez*); see also § 437c, subd. (p)(2).)

A triable issue of material fact exists "if ... the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion[.]" (*Aguilar, supra,* 25 Cal.4th at p. 850; see also § 437c, subd. (c).)  It " 'can only be created by a conflict of evidence.  It is not created by "speculation, conjecture, imagination or guess work." ' "  (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 525 (*Brown*).)  "All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment."  (*Martinez, supra,* 47 Cal.App.4th at p. 341.) On an appeal from a grant of summary judgment, the record and determination of the trial court are reviewed de novo.  (*Koussaya v. City of Stockton* (2020) 54 Cal.App.5th 909, 926 (*Koussaya*).)

## II.  Basis of all causes of action

It has long been "recognized that peace officers have a duty to act reasonably when using deadly force."  (*Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 629 (*Hayes*).)  The gravamen of each of Cuevas's causes of action was that the officers unreasonably used deadly force.  Each cause of action thus shares a common predicate: unreasonable use of force.  (See *Murchison v. County of Tehama* (2021) 69 Cal.App.5th 867, 897–898 (*Murchison*) [Bane Act, battery]; *Koussaya, supra,* 54 Cal.App.5th at p. 932 [battery, IIED, and negligence]; *Bender v. County of Los Angeles* (2013)

---

[3] Subsequent statutory references are to the Code of Civil Procedure unless stated otherwise.

8.

217 Cal.App.4th 968, 977, fn. 4 [Bane Act]; *Brown, supra,* 171 Cal.App.4th at p. 534 [negligence and battery].) Therefore, if the officers' conduct was reasonable as a matter of law, summary judgment was proper on all claims.

## III. The objective standard of reasonableness for police use of force

The parties' arguments center on whether the officers reasonably used deadly force under the totality of the circumstances. If an innocent bystander "suffers physical injury during a deadly force incident, that person may have a negligence claim based on the officer's duty to act reasonably when using deadly force against the suspect." (*Golick v. State of California* (2022) 82 Cal.App.5th 1127, 1140.) Police officers owe bystanders the same duty they owe to a suspect, "which is the duty to use reasonable force under the totality of the circumstances." (*Brown, supra,* 171 Cal.App.4th at p. 526, fn. 10.) Thus, a bystander injured by officers targeting a fleeing suspect may have a claim against the officers if the officers acted unreasonably. (*Ibid.*) But the bystander's claim will fail if the use of force was reasonable. (*Ibid.*)

" ' " 'Unlike private citizens, police officers act under color of law to protect the public interest.' " ' " (*Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675, 685 (*Lopez*).) While attempting an arrest, officers "need not retreat or desist from [their] efforts by reason of the resistance or threatened resistance of the person being arrested." (Former Pen. Code, § 835a, added by Stats. 1957, ch. 2147, § 11, p. 3807;[4] *Lopez,* at p. 685.) They need not " 'choose the "most reasonable" action or the conduct that is the least likely to cause harm' " when apprehending a violent suspect. (*Hayes, supra,* 57 Cal.4th at p. 632.)

---

[4] Penal Code section 835a was amended in 2020 and again in 2026, but this quoted text appears in all three versions. (Former Pen. Code, § 835a, subd. (d), amended by Stats. 2019, ch. 170, § 2; current § 835a, subd. (d), amended by Stats. 2025, ch. 241, § 24.)

"The reasonableness of an officer's conduct is determined in light of the totality of the circumstances" (*Hayes, supra,* 57 Cal.4th at p. 629), and is " 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' " (*id.* at p. 632).  "Summary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find" the officer acted unreasonably.[5]  (*Id.* at p. 632.)

The preshooting conduct of law enforcement personnel can be relevant to the reasonableness of force inquiry "to the extent it shows, as part of the totality of the circumstances, that the shooting itself was negligent."  (*Hayes, supra,* 57 Cal.4th at p. 631.)  A use of force may be viewed as reasonable in isolation, but "preshooting circumstances might show than an otherwise reasonable use of deadly force was in fact unreasonable."  (*Id.* at pp. 629–630.)  But "[t]he reasonableness of [officers'] preshooting conduct should not be considered in isolation …; rather, it should be considered as *part of the totality of the circumstances* surrounding [a] fatal shooting[.]"  (*Id.* at p. 637.)

## IV.    Analysis

Cuevas does not dispute the legal standards for assessing a use of deadly force. She asserts there is a dispute of fact as to whether (1) Officer Garcia's preshooting conduct of putting the police dog into the sedan was unreasonable and escalated the situation into a shooting; and (2) the remaining officers acted unreasonably by firing

---

[5] Penal Code section 835a, in its 2019 amended form, reaffirms the principle that "the decision by a peace officer to use force shall be evaluated from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight, and that the totality of the circumstances shall account for occasions when officers may be forced to make quick judgments about using force."  (*Id.*, subd. (a)(4).)

It also provides that an officer "is justified in using deadly force … when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary … [¶] … [t]o defend against an imminent threat of death or serious bodily injury to the officer or to another person."  (Pen. Code, § 835a, subd. (c)(1), (A).)

indiscriminately into the sedan. Neither of these points presents a triable issue, given the undisputed facts. We address them in order.

## A. Officer Garcia's deployment of the police dog

Cuevas alleges there is a dispute of fact as to whether Officer Garcia "negligently provoked Mr. Castro's gunfire—and provoked the other officer's responsive gunfire into the car—by thrusting his dog through the broken car window without notice of warning when the scene was otherwise stable and [Sergeant] Garcia was executing his plan to communicate with the driver." She asserts that after Sergeant Garcia broke the sedan's window, Castro stopped revving his engine. She says that "[i]n that quiet 15–30 seconds, Mr. Castro was never given a chance to comply with orders that [Sergeant] Garcia or others *were about to give* him."

Cuevas's characterization of that period as "quiet" has no basis in the evidence. Cuevas relies on Sergeant Garcia's testimony as establishing that Castro stopped revving his engine *permanently* after Sergeant Garcia broke the window. Cuevas's counsel asked Sergeant Garcia in his deposition if Castro stopped revving the engine "as soon as he broke the window." Sergeant Garcia answered, "Seems about right, yes." Sergeant Garcia was not asked any more questions about that point. Cuevas asserts Sergeant Garcia's answer to that question proves that Castro permanently stopped revving the engine, but that is speculative. Sergeant Garcia's testimony establishes that the revving of the engine stopped for at least a moment after the window was broken but does not speak to whether it started revving again. Officer Garcia testified unequivocally that after the window was broken, Castro stopped revving the engine only momentarily before continuing again; the tires continued to spin "intermittently," he said. Sergeant Garcia's and Officer Garcia's testimonies are not inconsistent with each other, and there is no evidence cited to dispute Officer Garcia's testimony. Officer Garcia also testified that

11.

after the window was broken, he warned Castro "many times" that if Castro did not "stop the car" he would "send the dog." Cuevas cites no evidence to dispute this.

Thus, Officer Garcia's undisputed testimony shows that the 15–30 seconds between the window breaking and Bane's deployment were not "quiet," as Cuevas describes. In that period, Castro continued to rev up the engine intermittently while ignoring "many" warnings that the dog would be deployed if he did not stop. Officer Garcia also testified that he feared the sedan could become unstuck at any moment and strike the officers. The factual basis of Cuevas's claim that Officer Garcia acted negligently in deploying Bane is therefore unsupported by the record.

The undisputed facts show that Officer Garcia acted reasonably as a matter of law in deploying Bane. Cuevas claims that Officer Garcia's "unilateral, unauthorized decision to deploy his canine into the vehicle violated [Tulare Police Department] policy." She cites two sentences of Tulare Police Department's canine policy, section 318.6.1, which covers preparing for the deployment of a canine. First: "As circumstances permit, the canine handler should make every reasonable effort to communicate and coordinate with other involved members to minimize the risk of unintended injury." Second: "A supervisor who is sufficiently apprised of the situation may prohibit deploying the canine." These provisions do not require the canine handler to get supervisor permission before deploying the canine. Officer Garcia further testified he told Sergeant Garcia that if he (Sergeant Garcia) broke the sedan's window, he (Officer Garcia) could deploy his dog. Sergeant Garcia said he could not remember whether a conversation about the dog happened, and he also never testified that he would have denied a request to use the canine given the circumstances.

Cuevas also attempts to create a triable issue by citing her police canine expert's opinion that canine handlers are trained to send canines into a vehicle only "from a distance with cover for the canine handler." The expert added that no reasonable canine

handler "would go up to a suspect's window on a felony traffic stop." It was "completely unsafe" and any officer who would do so is "unstable and unfit for law enforcement." The expert also stated: "After the pursuit ended, Officer Garcia placed himself, the passengers, the police dog, and the driver in danger. His actions resulted in the shooting of Rosa Cuevas and the killing of his police service canine, Bane." Properly read, the expert's opinion does not mean that it was unreasonable to deploy the dog at all, only that Officer Garcia put himself in danger by deploying it from close distance and away from cover. Nor does it mean that deploying the dog from a distance would have lowered the chance of Castro pulling a gun and shooting. The expert identified no disputed fact that would render the deployment decision itself unreasonable given the undisputed circumstances: a noncompliant driver, intermittent engine revving, ignored warnings, and a reasonable belief the car could be used as a weapon.

True, Officer Garcia testified that he knew that people against whom a police dog is deployed will "often" try to "resist the bite" or "defend themselves." But he also testified that he did not know there were any weapons in the sedan and that he "absolutely didn't expect" Castro would respond to the dog by shooting. He said the "typical" defensive response from a suspect is to try punching the dog "or something like that." Cuevas cites no evidence that a reasonable officer in Officer Garcia's position had any basis to foresee that deploying the dog would provoke an armed response, let alone a gunfight. The fact that, in hindsight, the dog deployment may have caused Castro to start shooting does not establish that such a response was foreseeable at the time.

It bears noting that the canine deployment was itself a less than lethal use of force. Officer Garcia was confronting a noncompliant driver whom he reasonably believed was attempting to use a vehicle as a weapon against officers. Faced with that threat, Officer Garcia chose the dog, a painful but non-lethal means of achieving compliance. That choice reflected a measured, proportional escalation; in other words, a reasonable

13.

escalation. That there may have been other reasonable alternatives to the dog deployment does not mean that Officer Garcia acted unreasonably. (*Hayes, supra,* 57 Cal.4th at p. 632 [officer's conduct need only fall within the range of reasonableness and need not be the "most reasonable" choice available].)

Cuevas compares the facts here to those in *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575 (*Grudt*), a wrongful death case where our Supreme Court held that it was improper for the trial court to remove the issue of negligence from a jury in a deadly force case alleging wrongful death under California law. (*Id.* at p. 587.) There, two plainclothes officers in an unmarked car attempted to make an early morning (12:15 a.m.) traffic stop of the hearing-impaired Grudt after he almost hit two pedestrians in a crosswalk. (*Id.* at p. 581.) The officers' vehicle did not have a red light or siren. (*Ibid.*) Grudt refused to pullover. (*Ibid.*) Two other plainclothes officers in another unmarked car joined the pursuit. (*Ibid.*) After Grudt stopped his car, one of the officers got out of his car "and loaded his double-barreled shotgun as he approached Grudt's car." (*Ibid.*) The officer then "tapped loudly on the closed left front window of [the victim's] car with the muzzle of his shotgun." (*Ibid.*) Grudt accelerated his car to the left, at which time the officer fired his shotgun toward Grudt's car. (*Id.* at p. 582.) Another officer also fired his revolver into the car. (*Ibid.*) Grudt died within seconds of the shooting. (*Ibid.*)

Our Supreme Court concluded that, even if a jury believed that Grudt was accelerating at the time of the shooting, other evidence raised a reasonable doubt whether the officers acted reasonably in their actions before the shooting. (*Grudt, supra,* 2 Cal.3d at p. 587.) The Court explained that a jury could find that Grudt believed he was being robbed and that the officers were negligent "when they originally decided to apprehend Grudt, when they approached his vehicle with drawn weapons, and when they shot him to death." (*Id.* at p. 587.) This case bears little resemblance to *Grudt* because it is indisputable that Castro knew he was being pursued by police officers.

14.

## B. The remaining officers' use of deadly force

The totality of the circumstances, from the point of view of Sergeant Garcia, Bradley, and Puente, shows that their use of deadly force was reasonable as a matter of law. To begin, there is no dispute that Castro opened fire on Officer Garcia and Bane and that the remaining officers knew Officer Garcia had been hit. There is thus no dispute that Castro posed an imminent threat of death or serious bodily injury.

An officer faced with an armed suspect need not " 'hold fire in order to ascertain whether the suspect will, in fact, injure or murder the officer.' " (*Martinez, supra,* 47 Cal.App.4th at p. 345; *Koussaya, supra,* 54 Cal.App.5th at pp. 941–942 [officers "not required to retreat or desist from his efforts to apprehend [felons] on account of their violent resistance"].) Also, "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." (*Plumhoff v. Rickard* (2014) 572 U.S. 765, 777.) They also need not withdraw in such circumstances. (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 518.)

The situation here suddenly turned deadly when Castro opened fire. After seeing Officer Garcia fall, the three remaining officers had no time to pause and reflect; they needed to react immediately to protect Officer Garcia and themselves. Cuevas faults the officers based on their testimony that none of them could clearly see the gunman inside the sedan when they returned fire and that none of them took any precautions for any possible innocent passengers. She argues each officer acted unreasonably by not acquiring a clear sight on Castro before opening fire given that there could have been innocent passengers in their line of fire. She asserts the officers fired indiscriminately at the car, using a "spray and pray" tactic. She claims their conduct violated fundamental rules of firearm safety, including: knowing what lies beyond your target before firing, being aware that a missed shot can strike an unintended target, clearly identifying your

target before shooting, and being aware of everyone around you and making sure no one is in your line of fire. The three officers who shot acknowledged they had been taught all these rules.

The undisputed facts show the officers did not fire indiscriminately. To the contrary, the officers' testimony establishes that they fired with a specific, identified tactical objective. Sergeant Garcia fired into the "driver's area," where he had seen muzzle flash from Castro's gun. Bradley aimed at the "driver's seat area" because he knew that is where the shots came from. And Puente fired toward the "driver's seat," which is where he had seen muzzle flashes and knew shots were coming from. None of the officers testified they fired indiscriminately or in a "spray and pray" fashion. Instead, their testimony establishes that they each used every piece of available information to direct his fire as accurately as the circumstances permitted—it was dark outside and the sedan's windows were tinted, making it hard to see the occupants. This is disciplined, threat-focused return fire under extraordinarily difficult conditions, and the fact that the officers did not achieve perfect accuracy does not render the response unreasonable.

Cuevas makes much of the officers' testimony that while returning fire they were not concerned about passengers, characterizing it as indifference to innocent bystanders. No reasonable juror would agree. When officers are being shot at, it is natural and indeed necessary that their attention fix on the person shooting at them. A hyper focus on the shooter does not imply indifference to innocents. By directing their fire toward the driver's seat and the muzzle flash, the officers here took the most effective action available to neutralize the threat endangering them. The testimony that Cuevas characterizes as evidence of indifference is, properly understood, evidence of exactly the kind of focused, disciplined response that was reasonable under these circumstances.

Three cases are instructive. In *Brown, supra,* 171 Cal.App.4th 516, police were conducting surveillance on a murder suspect, Ojeda, in a strip mall. (*Id.* at p. 521–522.)

16.

When Ojeda got into his car, an officer moved in to arrest him. (*Id.* at p. 522.) Ojeda drove over a curb and onto the sidewalk then "gunned" it toward two officers, Ransweiler and Baldwin. (*Ibid.*) Baldwin could not get out of the way due to his positioning, so he shot in the direction of the car, aiming for the windshield. (*Ibid.*) The bullets struck the windshield and the suspect crashed into a parked car. (*Ibid.*) As Baldwin was moving to get away from Ojeda's car, he tripped and fell. (*Ibid.*) Several other officers, including Ransweiler, feared Baldwin was about to be run over, so they fired 33 or 34 rounds at Ojeda. (*Id.* at pp. 522–523.) The plaintiff was struck by the officers' gunfire while sitting in the lobby of her dentist's office, which was in the strip mall. (*Id.* at p. 521.)

The plaintiff sued several of the officers for negligence and battery. (*Brown, supra,* 171 Cal.App.4th at p. 523.) Summary judgment was granted, and the plaintiff appealed the grant of summary judgment for defendant Ransweiler. (*Id.* at pp. 523–524.) The Court of Appeal affirmed, concluding the shooting was reasonable as a matter of law. (*Id.* at p. 525.) The court explained: "Ojeda's actions clearly indicated his intent to harm the officers. In response to a strong show of force by officers in raid gear who ordered Ojeda to get out of his vehicle, Ojeda instead drove his vehicle up onto the sidewalk adjacent to the strip mall, 'gunned' the engine, and drove directly toward Ransweiler and Baldwin. After Ransweiler dove out of the way, he saw Baldwin fall to the ground while still in front of Ojeda's vehicle. Ransweiler's fear that Ojeda would run over Baldwin was reasonable given these circumstances. [¶] Once Ojeda took this extreme action in response to police orders to surrender, Ransweiler acted reasonably in shooting at him, to attempt to stop Ojeda from harming Baldwin or a third party, or escaping. Ransweiler's use of force was not excessive or unreasonably dangerous relative to the danger Ojeda's actions posed. Ransweiler shot at Ojeda five times, from a relatively close distance. Ransweiler did not shoot into a crowd. Rather, he shot in a direction away from buildings in the strip mall. In view of the exigency of the

circumstances he was facing, Ransweiler met his duty to use reasonable care in employing deadly force." (*Id.* at pp. 528–529.)

In *Koussaya, supra,* 54 Cal.App.5th 909, a woman alleged police were liable for injuries she sustained while being held hostage by bank robbers. The woman was one of three hostages taken during a bank robbery. (*Id.* at pp. 914–915.) The robbers walked the hostages outside and into a Ford Explorer, and a vehicle pursuit ensued. (*Id.* at p. 915.) Less than a minute into the pursuit, one of the hostages was shot and pushed out of the Explorer. (*Id.* at p. 915.) Then another robber "fired a barrage of bullets" from an assault rifle at a pursuing police car, shattering the Explorer's back window. (*Id.* at p. 916.) The pursuit became a high-speed chase. (*Ibid.*) "At different times during the pursuit," two officers exchanged gunfire with one of the robbers, Martinez, in the back of the Explorer. (*Ibid.*) After the last exchange of gunfire, the plaintiff feared she would be shot if she remained in the car when the chase ended, so she jumped out of the Explorer. (*Id.* at p. 918.) The chase ended minutes later, "at which point police officers fired several hundred rounds into the Explorer, killing two of the robbers … and the remaining hostage." (*Id.* at p. 919.)

The plaintiff sued the city and the officers who fired at the Explorer while she was in it, asserting claims for assault and battery, intentional infliction of emotional distress, and negligence. (*Koussaya, supra,* 54 Cal.App.5th at p. 919.) Her theory was that the officers' use of deadly force against the robbers was unreasonable and caused her injuries. (*Ibid.*) The trial court granted the city and officer defendants' separate motions for summary judgment. (*Id.* at pp. 920, 924–925.)

The Court of Appeal affirmed the grant of summary judgment for the officer defendants, finding the officers' use of deadly force against the robbers was reasonable as a matter of law. (*Id.* at p. 936.) The court first explained that no reasonable juror could disagree that Martinez posed a significant threat of death or serious bodily injury to not

18.

only the pursuing officers, but to "the lives of countless innocent bystanders." (*Id.* at p. 937.) The court next acknowledged that the officer defendants endangered the plaintiff's life by firing at Martinez but still held that "no reasonable juror would conclude [the officers'] actions were outside 'the range of conduct that is reasonable under the circumstances.' " (*Id.* at p. 937.) In support of this holding, the court noted that, at the time the first officer fired at Martinez, Martinez had already fired an AK-47 rifle at officers and disabled at least one police car. (*Id.* at p. 938.) The court stated that a reasonable officer in that first officer's position would have been "more than justified" in believing that Martinez could seriously hurt or kill someone if he did not take immediate action. The court added that the officer's action was also reasonable. (*Ibid.*)

Here, as in *Brown* and *Koussaya*, Sergeant Garcia, Bradley, and Puente had reason to believe Castro posed a significant threat of death or serious physical injury to themselves and Officer Garcia. No reasonable jury could conclude otherwise. And as in those cases, the use of deadly force here was neither excessive nor unreasonably dangerous in relation to the danger Castro posed. After Castro opened fired and hit Officer Garcia and Bane, the remaining officers quickly took aim toward the driver's seat and fired back to protect themselves and Officer Garcia from the deadly threat.[6]

*Lopez, supra,* 196 Cal.App.4th 675, presents perhaps the most compelling parallel. There, a SWAT team attempted to rescue a 19-month-old hostage, Suzie, from her father,

---

[6] Counsel for Cuevas has emphasized two cases, *Murchison, supra,* 69 Cal.App.5th 867, and *A.B. v. County of San Diego* (2025) 112 Cal.App.5th 404, in his briefing and at oral argument. Both cases involve reversals of summary judgment in favor of law enforcement defendants. Both also involved claims of excessive force or restraint by law enforcement officers while plaintiffs (or plaintiff's decedent in *A.B.*) were being taken into custody. Neither case involved any violence directed at the officers by the plaintiffs or had any aspect of officers defending themselves from an imminent threat, as we have here. These cases are factually inapposite to the situation in the present case.

Peña, who had taken her to his auto shop, threatened repeatedly to kill her, and shot at officers four times while holding her as a shield. (*Id.* at pp. 678–679.) After negotiations failed, a sniper fired at Peña as he reached for his weapon. (*Id.* at p. 681.) SWAT officers then entered the auto shop and pursued Peña into a small interior office where he continued shooting at officers, hitting one of them. (*Id.* at pp. 681–682.) The officers fired 50 to 55 shots inside the office within 3.5 to 6 seconds, killing both Peña and Suzie. (*Id.* at p. 682.) One of the officers, who fired 11 shots while aiming at Peña's left torso since he had seen Suzie in Peña's right arm, "was blinded by muzzle flashes from Peña's weapon and could not see Suzie." (*Ibid.*)

Suzie's mother sued for negligence and wrongful death on the basis that the officers used unreasonable force. (*Id.* at p. 683.) The trial court granted the City's nonsuit motion, finding that no reasonable juror could conclude the officers' use of force was unreasonable. (*Id.* at pp. 683–684.) On appeal, the plaintiff argued that the manner of the shooting was unreasonable given that Peña was holding Suzie as a shield during the confrontation, and that the officers should have retreated when they realized Peña had not been incapacitated by the sniper's initial shot. (*Id.* at pp. 690–692.)

The Court of Appeal affirmed. It held that in view of the exigency of the circumstances— Peña was shooting directly at officers inside a small office, had hit one of them, and had repeatedly threatened to kill the child he continued to hold as a shield— the officers' use of force was reasonable as a matter of law notwithstanding the volume of fire. (*Lopez, supra,* 196 Cal.App.4th at p. 690.) As to the plaintiff's suggestion that the officers should have stopped after each shot to assess the effect on Peña, the court stated that this "fails to recognize the perspective of the reasonable officer at the scene." (*Ibid.*) The court further held that the plaintiff's expert opinion that the officers should have retreated did not raise a triable question because it was based on assumptions without evidentiary support and offered no reasoned explanation for why retreat was

20.

either required or desirable while a hostage remained in imminent peril. (*Id* at pp. 691–692.)

*Lopez* is particularly instructive here for at least two reasons. First, it confirms that the number of shots fired does not by itself render the use of force unreasonable when officers are responding to an active and ongoing deadly threat. Second, it makes clear that an officer's use of force is not rendered unreasonable simply because the circumstances made perfect accuracy unachievable, even when innocent bystanders are in immediate proximity to the suspect. Both principles apply with equal force here. The officers' actions here were reasonable as a matter of law.

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

SNAUFFER, J.

WE CONCUR:

LEVY, Acting P. J.

FRANSON, J.